■ GRACE GIUAMARA et al., Appellants, v JOHN O'DONNELL, Respondent. — In a negligence action to recover damages for personal injuries, etc., plaintiffs appeal from a judgment of the Supreme Court, Westchester County (Rubenfeld, J.), dated April 5, 1982, which, after a jury trial, dismissed their complaint. Judgment reversed, on the facts and as a matter of discretion, and new trial granted, with costs to abide the event. Plaintiff Grace Giuamara's uncontroverted testimony, corroborated by her daughter's testimony, indicated that on October 12, 1972, the car, which said plaintiff was driving, was stopped on an access ramp to a parkway when it was struck in the rear by a car driven by defendant. In the absence of any affirmative evidence introduced by defendant disputing plaintiffs' version of the rear-end collision or establishing negligence on the part of plaintiffs, we are of the opinion that the jury's verdict in favor of defendant, based upon a finding that plaintiffs were contributorily negligent, was against the weight of the evidence (cf. *O'Boyle v Avis Rent-A-Car System,* 78 AD2d 431, 439). Were we not otherwise ordering a new trial, we would nevertheless be compelled to do so based upon the gross impropriety of defense counsel's conduct. During his summation, defense counsel made several references to his own personal opinions and experiences. He specifically suggested that there was mystery and a web of deception underlying the

instant case and referred to the case as "all of this chicanery". Defense counsel commented: "You know, there have been emotional moments in this case, and I have to admit to you there are times when I was thoroughly angry. Well, that's not evidence, of course. But frankly, I haven't tried a case with as much mystery to it as this one — ever. In some ways, as this case unfolded I was reminded of the time reading a suspense or mystery novel where all of a sudden there is some new twist or turn and there are efforts to conceal things. Then the layers of truth start to unfold, and all of a sudden there is a new thing. Of course, in books, you know, usually the author will make everything clear at the end. You are not still left with mysteries of uncertainties, or unknowns. Life is not like that. Sometimes you can try a case like this, and at the end of the case there are things that are still very mysterious or suspicious or peculiar. I'm not in a position to unfold it for you, like an author in a book." Defense counsel insinuated that plaintiffs used various spellings of their names for different purposes and suggested that plaintiff Grace Giuamara at times used her maiden name for purposes of deception: "What's the mystery about the names. What's this lady's real name. What's her husband's real name. Where is her husband today, the guy who was in court here four days in a row and sat over there in the corner. * * * The following morning we got the Lawrence Hospital obstetrical record in, where she was at the hospital, and then we find out her husband's name is Emmanuel, and his nickname is Manny. He's not Frank Guiamara [sic]. And in fact, yesterday we found out that the State of New York has her official name as G-u-i-a-m-m-a-r-r-a, not G-i-u-a-m-a-r-a. * * * Now, I know of at least, maybe five, maybe six different spellings of that name that she has had. You know, she doesn't even use the name Guiamara [sic] in any form at Saks, she uses the name Marlow, M-a-r-l-o-w. Well, that's her maiden name, she says. But that's not what the hospital record says at the Lawrence obstetrical there in 1973. They gave her father's name as Rainey and her mother's name as Powell. * * * You know what? When people misspell their name like that, with a G-u, instead of a G-i, in this Metropolitan area where you have ten million people, that's enough to throw you off the trail and to confuse you. You go down to a hospital and say, 'I want a record for G-i-a-m-a-r-a,' and they are surely not going to give you a G-u-i-m-m-a-r-r-a, because to them that's somebody else. The same thing goes if you try to check accident records with the State of New York. You can go in with the wrong name, you can't get the right name. * * * That's deliberate deception, and its a mystery, isn't it. I don't know whether Mr. Guiamara [sic] is a criminal and he doesn't want you to know who he is, or whether there is Welfare being claimed under six different names at five different addresses in New York City, or what. I have no idea. It's a mystery, and I don't expect to know because I hope I don't see the lady again, or her husband. And I don't want to hear anything about them any more, because I know what I went through to defend my clients." Defense counsel further injected his opinion with respect to certain subjects. On plaintiffs' financial situation, counsel remarked, "These are not poor people, either. These are not people scraping along. I have never owned a Lincoln Continental car. In 1972 that was the most expensive American car that I know of". With respect to plaintiffs' conduct in bringing the instant action, counsel commented: "You know, this is the kind of conduct which is destructive to our society. It's the kind of thing which destroys the very web and fabric of our country. And it's the kind of thing which, if certified by you could be substantially damaging to my clients the O'Donnells". Defense counsel referred to Dr. Lowe, a chiropractor in New York whom Grace Giuamara had visited in 1981 as "some quack in New York City who doesn't have a telephone listing and who is apparently just a chiropractor on 42nd Street". He called plaintiffs' attorney "a very, very clever

lawyer from a very prestigious New York City law firm in the Empire State Building". Moreover, defendant's attorney unnecessarily elaborated on the issue of religion, as follows: "You know, I know there are people, there is a church — the Christian Science Church doesn't like to go to doctors; I know that, and I believe that's common knowledge. This lady has gone to great pains to tell you what her religion is, and that's not the common thing in this country. I mean, I'm going to tell you very frankly, we are supposed to treat people equally, regardless of race, religion or creed. This is America, it's a free country and you can go to any church you want. It's a good thing and its one of our dearest possessions. I don't know whether you ever experienced this thing, but the person who hangs his religion on his coat like a flag is somebody who may not be really religious. * * * But when you say, 'I'm religious,' you bring it into the case for a reason. The only reason the Judge allowed it in, and you could see when he made the ruling, he said, 'I assume she doesn't take medication'. Well, she has been taking medication right along when the doctor says it and when she needs it. The only reason she says she's religious is for the same reason they asked you not to be overly suspicious. Because there is something wrong with this case, that's why, and because they want you to say, 'Well, this is a religious woman. It doesn't sound right to me. She's religious, and therefore it's got to be believable.' That's the logical thing they want you to conclude. I say to you, the very fact they had to introduce that into evidence — I have no feelings about her church. If she wants to go, I respect her for it, I don't care about it at all. It has nothing to do with my client, either. But I say to you if it's a shroud to conceal a fraud, it should be rejected." Finally, we take note of the following particularly inflammatory questioning by defense counsel of defendant's expert witness, Dr. Sonnenberg: "[DEFENSE COUNSEL]: All right Doctor, have you ever heard of a term, Green Poultis Syndrome? [DR. SONNENBERG]: Yes. [DEFENSE COUNSEL]: Have you seen examples of it yourself, Doctor? [DR. SONNENBERG]: Many times. [DEFENSE COUNSEL]: Would you tell the jury what that is, sir? [DR. SONNENBERG]: It's an injury that is cured up with a nice big insurance check. [DEFENSE COUNSEL]: Are you telling us, Doctor, that people sometimes attribute symptomology to accidents, that is really attributable to something else for the purpose of collecting money in lawsuits? [DR. SONNENBERG]: Yes. [DEFENSE COUNSEL]: Or other accident claims of one sort or another? [DR. SONNENBERG]: Yes. [DEFENSE COUNSEL]: This is well known among the medical profession? [DR. SONNENBERG]: Yes. MR. BECKER [PLAINTIFFS' ATTORNEY]: Objection. This is totally improper. THE COURT: It's common knowledge. You don't have to say what the medical profession says, it's common sense". Accordingly, the cumulative effect of these and other prejudicial and highly inflammatory remarks made by defense counsel, which were totally irrelevant to any legitimate issue presented at trial, would require reversal of the judgment (cf. *La Russo v Pollack*, 88 AD2d 584; *Caraballo v City of New York*, 86 AD2d 580; *Cusumano v New York City Tr. Auth.*, 75 AD2d 801). Damiani, J. P., Titone, Lazer and Boyers, JJ., concur.