(July 24, 1986)

■ BRIAN DUFFEY, an Infant, by His Parents and Natural Guardians, ROBERT W. DUFFEY and Another, Respondent, v ROBERT E. FEAR, Appellant.—Judgment, Supreme Court, Bronx County (Joseph L. DiFede, J., and a jury), entered December 10, 1984, upon a jury verdict in favor of plaintiff in the total sum of $1,740,000, reversed, on the law, without costs, and the matter is remanded for a new trial.

In this medical malpractice action brought by his parents on behalf of the infant plaintiff, Brian Duffey, to recover damages for the blindness he incurred following his premature birth as a result of a condition known as retrolental fibroplasia (RLF), the defendant doctor appeals from a judgment entered upon a general jury verdict in favor of the plaintiff in the total sum of $1,740,000. The theory of the plaintiff's case was that the condition causing blindness re-

sulted from administration of oxygen to him, which was required by his premature birth, and that the premature birth in turn was caused by defendant's malpractice in failing to remove from plaintiff's mother, following confirmation of her pregnancy, a previously inserted IUD, and in failing to inform plaintiff's mother of the risks incident to not removing a previously inserted IUD from a pregnant woman, in particular the risk of infection resulting in premature birth.

The devastating nature of the disability sustained by the infant plaintiff at the very beginning of his life gives to this case a special poignancy. Nonetheless, it is clear from a study of the record that the judgment entered in favor of the plaintiff may be sustained only if the court were to evaluate as harmless fundamental errors in instructions to the jury that went to the heart of the merits of the lawsuit.

From the testimony adduced on behalf of the plaintiff, although it is in certain respects disputed, the jury could reasonably have concluded that plaintiff had adequately established the following facts. On September 19, 1970, a doctor then treating plaintiff's mother inserted an IUD known as a Majzlin Spring to replace a previously inserted Lippes Loop that appeared to be in the process of being expelled. Believing that she was nonetheless pregnant, plaintiff's mother visited the defendant on December 22, 1970, who confirmed that she was pregnant, told her that the IUD was in place after a visual examination, and assured plaintiff's mother that its presence was not a matter of concern. She asked defendant about removal of the device, and he told her that removal would cause a miscarriage, and that if she wished an abortion it should be done in the appropriate way. After discussing the situation with her husband, plaintiff's mother decided to go ahead with the pregnancy. Thereafter she was examined periodically by the defendant and physicians with whom he was associated.

Plaintiff was prematurely born on May 8, 1971, some three months early. Following the administration of oxygen shortly after his birth, believed by attending physicians to be required by his physical condition, plaintiff incurred RLF which rendered him blind in both eyes. From expert testimony adduced on behalf of the plaintiff, the jury could reasonably have concluded that the prematurity of his birth was caused by an infection attributable to the presence of the IUD and that his blindness resulted from his premature birth.

Both the plaintiff's and the defendant's medical experts agreed, as did the other medical witnesses called on behalf of

the defendant, including the defendant himself, that it was known in 1970 that there was an increased risk of miscarriage during the first trimester from the presence of an IUD device, and that there was also some increased risk of miscarriage from the removal of that device even where the strings were visible, as the jury implicitly found to be the fact here. The defendant's expert further testified that it was not known in 1970 which alternative presented the greater risk of miscarriage, and that statistics indicating the desirability, from the standpoint of minimizing the risk of miscarriage, of removing IUD's whose strings were visible first became known in the medical profession in 1974. The record discloses no testimony by plaintiff's expert clearly to the contrary.

The principal issue dividing the experts concerned the state of medical knowledge in 1970 as to whether the retention of a previously inserted IUD in a pregnant woman increased the risk of premature birth. The testimony on that issue is best understood in the context of the legal issues raised by the court's instructions to the jury.

In the court's charge to the jury, the issues to be determined were presented in the following language:

"So the doctor here is charged with a deviation or a departure from accepted medical standards in 1970: either in not removing the IUD from Mrs. Duffey because of her pregnancy, or in having failed to advise her of what the risks were involved and what they might have been—lack of informed consent.

"Meaning what?

"That a patient should be given all the probable risks involved and let the patient decide whether to go through with the pregnancy or to have an abortion."

Turning to the first theory of liability presented to the jury, it becomes immediately apparent from a study of the record that no evidence was presented that justified its submission to the jury, or that would have supported a jury's verdict on that issue in favor of the plaintiff. The plaintiff's expert not only did not testify that it was a departure from accepted medical standards in 1970 not to have removed the IUD, but explicitly disclaimed making such a contention.

It is true that plaintiff's expert testified that, as of 1970, it would have been good medical practice to discuss what he described as substantial risks associated with an IUD in place in a pregnant woman, those risks being "early abortion, there is a loss of the pregnancy in the first trimester; the risk of

infection, and again premature labor and delivery", and that after discussing those risks with the mother, "I would make the suggestion that the IUD should be removed if the strings were visible." At no point, however, in his direct examination did he say that it was the standard practice in 1970 to have removed the IUD. When that question was explicitly put to him on cross-examination, he responded:

"A. I didn't say, nor did I say that it was standard practice to remove the IUD. I would be remiss to say that. It would be appropriate to discuss it with the patient and discuss the options with the patient.

"Q. Well, then you are not saying that in December of 1970 it was a departure not to remove the IUD, are you?

"A. No, I'm not."

No doubt there is a perplexing inconsistency between his testimony that the risks of a pregnancy with an IUD in place included prematurity of birth and his explicit statement that it was not standard practice to remove the IUD, for which there is no clear explanation in the record. One possible explanation is that although the doctor himself believed in 1970 that there was such a risk, he recognized that it was not the general understanding of the medical profession. Another is that his testimony with regard to the risk of premature birth in 1970 was retrospectively based upon statistics developed some years later. In this connection, it was clearly elicited from him that there was no published report in 1970 of premature births being connected with the presence of an IUD, and that the first clear recommendation by a professional group that IUD's be removed was published in 1974, and that was based upon information that had developed indicating that miscarriages during the first trimester were substantially more likely to occur with an IUD in place than would occur if an IUD were removed, assuming that the strings were visible. Whatever the explanation may be, it is clear that plaintiff adduced no evidence that the failure to remove an IUD was a departure from accepted medical practice in 1970.

As against this total absence of evidence in the plaintiff's case to support the first theory of liability presented to the jury, there is the testimony of defendant's expert witness, the defendant himself, and two other medical witnesses, that the defendant's failure to remove the IUD device was not a departure from approved practice in 1970, and that there was no understanding in the medical community at that time that

the retention of previously inserted IUD's in pregnant women posed a risk of premature birth.

Under well-established and familiar principles, the absence of legally sufficient evidence to support the first theory of liability would require reversal of the judgment appealed from even if recovery on the second theory of liability would have been otherwise appropriate. The principle is well established that a general verdict entered in response to separate theories of liability must be assumed to have been based on both. (*Davis v Caldwell*, 54 NY2d 176.)

In any event, the second theory of liability presented was also fundamentally defective. As presented by the trial court, in what was a clear departure from the theory of the plaintiff's case, the jury was instructed to determine whether plaintiff's mother, appropriately informed as to the risks involved, would have decided "to go through with the pregnancy or to have an abortion." In short, the court's instruction permitted the jury to return a verdict for the plaintiff on the basis of what has come to be known as a "wrongful life" claim, a principle of liability that has been explicitly disapproved by the Court of Appeals. (*See, Becker v Schwartz*, 46 NY2d 401; *Alquijay v St. Luke's-Roosevelt Hosp. Center*, 63 NY2d 978.) Moreover, even if the theory propounded to the jury were legally viable, which clearly it was not, the record discloses no evidence whatever to support a finding that plaintiff's mother, if informed of the risks as described by her expert, would have had an abortion. The obvious premise of the plaintiff's case with regard to the defendant's failure to inform the plaintiff's mother was that if she were properly informed in accordance with the risks testified to by her expert, she would have chosen to have the device removed, not that she would have had an abortion. The issue in fact raised by plaintiff's proof was never submitted to the jury.

Reversible error also occurred when the trial court failed to submit to the jury the issue of proximate cause, an issue squarely raised by defense testimony which, *inter alia,* disputed that the premature birth was caused by the IUD device. The defendant's written requests specifically included such proposed instructions, and the court confirmed in a precharge discussion with counsel that the defendant wished an instruction as to proximate cause. Concur—Murphy, P. J., Sandler and Milonas, JJ.

Fein and Ellerin, JJ., concur in a memorandum by Fein, J., as follows: I concur that there should be a new trial. I do so

upon the limited ground that the general verdict cannot stand since the case was submitted to the jury on two different theories of liability: (1) that in 1970 it was standard practice to remove the IUD; and (2) that in 1970 proper practice required that the risks and options be discussed with the patient. The expert testimony that it was standard practice in 1970 to remove the IUD was at best inadequate. Since the evidence to support this theory of liability was insufficient to sustain the verdict, there must be a new trial *(Davis v Caldwell,* 54 NY2d 176).