■ ERIC BERKOWITZ et al., Respondents, v MARRIOTT CORPO-

RATION et al., Appellants.—Judgment of the Supreme Court, New York County (Stephen Smyk, J.), entered on or about June 12, 1989, which, following a jury trial, awarded plaintiff Eric Berkowitz the sum of $7,625,000 plus interest and costs and awarded plaintiff Boni-Sue Berkowitz the sum of $300,000 plus interest and costs, is unanimously reversed on the law and the matter remanded for a new trial, with costs and disbursements.

This is an action for damages for personal injuries sustained by plaintiff Eric Berkowitz arising out of the collision between a Mercedes automobile operated by him and a tractor trailer driven by defendant Charles Haring and owned by defendant Marriott Corporation. Following a trial conducted in this matter, the jury, apparently finding that defendants' vehicle was entirely responsible for the accident and that plaintiff's severe back problems were not, as claimed by defendants, the result of childhood scoliosis but primarily caused, or greatly exacerbated by, the subject accident, rendered a verdict in favor of plaintiffs in a total amount in excess of $7,900,000. On appeal, defendants challenge the judgment against them on a variety of grounds relating to certain allegedly erroneous evidentiary rulings made by the court, the excessiveness of the monetary award and the purportedly improper cross-examination and summation by plaintiffs' counsel.

In that regard, it should be noted that while the Trial Judge did make some inappropriate evidentiary decisions, specifically by precluding Dr. Robert April from testifying about his second examination of plaintiff (see, Valenti v Chanice, 75 AD2d 850, wherein the court observed that the sanction of preclusion should not be invoked in the absence of surprise or prejudice) and accepting into evidence the police report notwithstanding that its contents consisted largely of inadmissible hearsay, these errors would not, by themselves, have required reversal of the judgment herein. However, what does mandate reversal is the reprehensible conduct of plaintiffs' counsel in cross-examination and particularly during his summation in the course of which he engaged in an unfair and highly prejudicial attack upon the credibility and competence of defendants' expert witnesses and attorneys. Accordingly, the two physicians retained by the defense were repeatedly depicted as "hired guns" who were brought into the litigation to "fluff up the case" and "fill up some time", and moreover, their testimony was attacked as having been designed solely to bolster defendants' attorney's "promise to you that he's going to show that there was no reason to obtain physicians

from Suffolk County except that they could not locate a physician who would support their case from here to Suffolk County * * *. After that, boy, it's Europe."

Plaintiffs' lawyer, referring to matters not in evidence, speculated that the Suffolk County physicians had been hired because there was some undisclosed relationship between them and defendants' present or prior counsel. Therefore, he remarked, "I can't conceive of any reason why you would have to go to Suffolk County to hire a doctor when you have so many doctors right here, the best in the world." Equally egregious was his statement that the defense attorney was merely carrying out "instructions from his principals, and possibly he doesn't even believe himself some of the things that he said, but he has to do what he has to do." The impact of the summation by plaintiffs' counsel, whose purpose was undoubtedly to discredit defendants' expert witnesses and attorneys, could only have been devastatingly prejudicial to defendants and amounted to a violation of their right to a fair trial. Although it would have been preferable for defense counsel to have objected to the improper comments as they were being uttered rather than waiting until the conclusion of the summation, the fact remains that the interest of justice compels that the judgment be set aside and the matter remanded for a new trial.

In order to illustrate the nature of the summation perpetuated by plaintiffs' counsel, some of his statements are being appended.

### APPENDIX

"It is the finest form of democracy; it is letting the little fellow bring his case in to court and have his case decided by a jury of his peers. And that is the most important thing that any of us can ever ask for is the ability to have the right to come before a jury of our peers and have our case decided by them.

"Now, Eric Berkowitz wouldn't have had any chance against a corporation the size of the Marriott Corporation if it weren't for the fact that in the eyes of the law everybody is the same, everybody has the same rights and everybody has the same obligations. And just as Eric has an obligation to prove certain things, so the Marriott Corporation has an obligation to prove certain things, depending on what the evidence shows. * * *

"[M]y colleague is a very experienced member of the Bar, and while I have never worked with him before, I respect him and I like him and I don't

blame him for the way that he tried this case. I know he had instructions from his principals, and possibly he doesn't even believe himself some of the things that he said, but he has to do what he has to do. * * *

"Not one doctor that he brought in, and I'll comment—obviously I will comment on why he had to go all the way out to the end of the world in New York, Suffolk County, and find two young doctors to testify, friend of each other. And why he would say to us during the course of his jury selection that he was going to prove certain things, when in fact he hasn't even hired his doctors yet.

"I think that possibly that might be something that you might want to know because he hired this fellow Kramer on Memorial Day. We'd already been on trial a week. And that was what Kramer said was the first time he ever spoke to him. So my colleague must really, really have some sort of insight into what's going on, if he knew before he even hired the guy what the guy was going to say. * * *

"Then it occurred to me, when I offered into evidence two reports of a Dr. April, it occured *[sic]* to me that the reason maybe that they went to Suffolk County is that Dr.—Mr. Steinbrecker, the prior attorney, had an office in Suffolk County.

"Now, I never thought to ask these guys if they knew Steinbrecker but I can't conceive of any reason why you would have to go to Suffolk County to hire a doctor when you have so many doctors right here, the best in the world. * * *

"He didn't have to bring Fox in here; he had to bring doctors in to fluff up the case. He didn't have to bring Fox in; he offered the records into evidence. I didn't object. * * *

"Did Fox actually add anything to this case?

"Did his Dr. April add anything to this case. He brought him in here so that he could fill up some time.

"We were going a witness a day so that it would appear as if he had some sort of a defense in this case. If you stop and you analyze what happened, well, one day he brought in Mrs.—my, what was her name? Miss Leona. What did he need her for? He offered the record into evidence; I didn't object to it. Dr. Levine's record. * * *

"Let me ask you, he subpoenaed everything under the sun. He went back to when this guy was 17 years old; he subpoenaed the records. Wouldn't you think he'd subpoena a cop? You're in here being sued for thirty, $50 million.

Quote the cop. Come in, tell us what happened. He didn't do that. He didn't even subpoena him.

"But the officer said when he got to the scene of the accident that the front bumper and wheel of the truck was touching the car. Now, I got to be frank with you. When I looked at these pictures, it was so obvious to me that this happened when something was coming from behind and hit it that I was not going to bring in Mr. Lane, Officer Lane. * * *

"You don't have to decide that there was an injury in this case because he brought a doctor from Suffolk County, paid him $4,000 to say that the accident was caused by this truck accident.

"Now, you might say to yourself, listen this guy don't look like any dope; why is he doing that? And I'll tell you why he did it. You got to admit to liability; there is no question. The police officer said the driver told me this is how it happened; I didn't know how it happened. * * *

"Didn't I ask every doctor, with the exception of Dr. Kramer, who's a nice fellow, there is no question about it, but Dr. Kramer was brought here because they had a neurosurgeon and they wanted an orthopedist. Because they had this guy Etkind examine and they didn't bring him in.

"He never made any explanation for why he didn't bring him in, and I know why. Because this is a guy who examined and said he didn't even have a scoliosis because this guy didn't have the faintest ideas of what this case was about. He was hired to do the same thing as April was, since he didn't talk much about April.

"Obviously he'd be happy to forget about him, so I won't mention anything about Dr. April or what his qualifications are or what his actual practice in law is—I mean in medicine is. Maybe that's a Freudian slip. * * *

"I mean, yes, there are certain things that I'm not even going to bother to worry about for the simple reason that the minute he asked Tyson if the accident caused the back condition, I don't care. I don't really care. He's not claiming that this back condition comes from something other than the accident because if he was, he wouldn't have brought a doctor in here from Suffolk County to say it was.

"So I don't have to answer certain things because certain things are really just raised. The whole purpose of this wonderful summation is to get you not to award what this young man is entitled to.

"There is a theory in law which says that if a man is entitled to $100

million, and you give him 50 million, you're not really doing him 50 percent justice; you're really doing him a 50 percent injustice. If you think about that for a minute, you'll see that that's true. * * *

"Of course his doctors came in and interpreted the Lenox Hill record and said they saw things that the radiologist who spent his whole life just taking and reading x-rays didn't see, and they saw things that help them in their attempted defense of this case to indicate that the scoliosis is some way involved in the continuing pain that he has in an attempt again to throw you off the track.

"I say to you I don't want to argue that argument; I don't care. I believe that both Dr. Balensweig and Dr. Head, who examined him—now remember these other two guys are hired guns who come in after the trial starts and say what they have to say after a lawyer makes a promise to you that he's going to show you certain things. He then goes out and gets somebody who's going to live up to that promise. * * *

"These other guys I never even heard of. I didn't know their names until they walked into court. When they were sitting there before he called them I didn't known their names. So that that's the kind of a manner that this case was tried and just—and I don't know if he stopped in Queens and looked for somebody, if he stopped in New York, if he went to Brooklyn.

"All I know is he couldn't have gone much further; he's close to Montauk. After that, boy, it's Europe. And no place could he find anybody from here to Suffolk County, and then two young guys who were friends. * * *

"He's got one baby, another one comes, and then—and I really, really was surprised at my colleague for doing this because I really think that this is not particularly appropriate, even if Marriott told him to do it, to talk about that little baby as if that little baby caused his depression.

"Forget the fact that you hit him with your truck and crippled him for life; that's nothing. You have a baby born with a problem. That's what we ought to pin it on, that's what you ought to pin it on, that's what he's saying. I'm sorry, I apologize, and maybe I did it too much, he says, but I have to find something to pin it on so let's pin it on that baby. That's what he said; I didn't say it. I didn't cross-examine on it. * * *

"I like Dr. Kramer. He's a nice, young guy, and I have certain empathy for Dr. Kramer because I know what orthopedic surgeons go through. I have one in my family, so I know just exactly what he went through; and I know why he came in here, and I know $4200 is a lot of money to him; and I know that he felt that he was doing the right thing to help his friend Tyson.

And to what extent he is in any way related to my colleague or my colleague's former associate I really don't know. * * *

"So I'll say that you do this much for Eric, for Boni, for Alexis and for Blythe, and I can't ask you to do any more. You deliberate with so much of your hearts and your minds and your souls and the very fibers of your beings so that when finally you come in to this courtroom after your deliberations are over and your Forelady, Miss Pilla a** gets up to read the verdict, that each of you can look this family in the eye and say to yourself, I've done you justice. They can ask for no more than that. And they are entitled to no less.

"God bless your deliberations.

"Thank you very much, Your Honor."

Concur—Ross, J. P., Milonas, Rosenberger, Kassal and Rubin, JJ.