■ NERY ESCOBAR, Individually and on Behalf of SERGIO ESCOBAR, JR., and Another, Infants, as Next of Kin of SERGIO E. ESCOBAR, Deceased, Respondent, v SEATRAIN LINES, INC., Appellant.—Judgment, Supreme Court, New York County (Edward Greenfield, J.), entered March 29, 1990, after a jury trial, in favor of plaintiff in the amount of $8,436,798.25, including interest and costs, unanimously reversed, on the law and on the facts, and a new trial before a different Justice is ordered on the issue of damages, without costs. Appeals from the orders entered on or about July 18, 1986, April 27, 1988, February 28, 1990 and March 27, 1990, are dismissed as subsumed in the judgment without costs. Motion No. 2291/ 1991 to strike a portion of plaintiff's brief is unanimously denied.

This action arises from the death of a longshoreman engaged in maritime employment on board a vessel, on navigable waters, and so is governed by the Longshore and Harbor Workers' Compensation Act (33 USC § 901 *et seq.*) and Federal maritime law *(Tibak v City of New York,* 154 AD2d 313, *lv denied* 75 NY2d 705; *Stuto v Coastal Dry Dock & Repair Corp.,* 153 AD2d 937, *lv dismissed* 75 NY2d 865). After a trial held in 1986, a jury found defendant liable, awarded damages of $869,000, but found decedent 70% negligent, resulting in an award of $260,700.

On January 26, 1989, we affirmed without opinion the trial court's order dismissing defendant's contributory negligence defense and setting aside the verdict as inadequate, and

ordered a new trial on damages only (146 AD2d 973). Upon retrial in May 1989 a jury awarded plaintiff $600,000 for past pecuniary loss, $2,400,000 for future pecuniary loss (which included $500,000 lost Social Security benefits), $2,000,000 for loss of society, and $250,000 to each of the decedent's two children for loss of nurture and care, which was reduced to $75,000 each by the trial court (150 Misc 2d 381). For reasons that follow, we are constrained to reverse the judgment entered in the amount of $5,150,000, plus interest of $3,285,953.25, plus costs and disbursements of $845, for a total of $8,436,798.25, and order a new trial on damages.

Ordinarily, establishing a decedent's future earnings, had he lived, is based upon the decedent's actual earnings history. Here, however, plaintiff was apparently discouraged by what the decedent's earning history would have yielded because the decedent, aged 47 at the time of his death in 1977, had never earned more than $26,588 in any one year, and in the five years preceding his death had earned $17,930 in average yearly salary. The trial court permitted plaintiff to equate decedent's earnings to those of one Juan Fernandez, who was not only qualified as an ordinary longshoreman, or "hold man" (as was the decedent), but also a straddle carrier and crane operator, and who had average yearly earnings of $38,981 in the four years after 1977. In the contract year closest to decedent's death, Fernandez had earned $41,311, which is 55% more than decedent's highest annual salary of $26,588. This fatally tainted the jury's verdict which awarded $600,000 in lost wages from February 1977 through May 1989 (averaging $48,980 annually), and $1,900,000 from May 1989 to decedent's projected retirement at 70 years of age (averaging $172,727 annually).

The award was grossly excessive, and was apparently accomplished through the testimony of plaintiff's economic expert, Dr. Edmund Mantell. (Plaintiff also read excerpts from the testimony of the late Eugene Spector, plaintiff's other economist at the first trial.) We observe that Dr. Mantell's testimony as an expert witness was cited by the Second Circuit Court of Appeals, which held, in reversing a judgment for pecuniary loss of a decedent's wife and children, that "[t]he most prejudicial of [the errors occurring in the course of the trial] was allowing the jury to consider as evidence Dr. Mantell's lengthy, extravagant, and non-probative projections of Dr. Lin's future income." (Shu-Tao Lin v McDonnell Douglas Corp., 742 F2d 45, 49 [1984].) Just nine months before that, the Second Circuit found Dr. Mantell's proposed testimony to

be "highly suspect" and "riddled with errors," and affirmed the determination of the District Court to exclude his testimony after it had noted "a number of assumptions and assertions made by Dr. Mantell that were so unrealistic and contradictory as to suggest bad faith." *(Shatkin v McDonnell Douglas Corp.,* 727 F2d 202, 208 [1984].)

In the case now before us, Dr. Mantell projected that decedent would earn an average of $56,111 per year through 1989, and $145,686 per year until the year 2005 when decedent would have been 75 years of age. Dr. Mantell's testimony was improperly founded upon comparison of the earnings and work history of Mr. Fernandez, whose qualifications and earnings history were substantially different from the decedent's. Dr. Mantell's $4,016,400 projection of decedent's survivors' total economic loss was in our view highly speculative, and denied the defendant a fair trial.

If we were not reversing on the grounds of Dr. Mantell's testimony, we would nevertheless have reversed on the basis of plaintiff's counsel's personal attacks on the defendant's trial attorney, and prejudicial appeals to the jury's passion and sympathy through the introduction of irrelevant evidence *(see, Berkowitz v Marriott Corp.,* 163 AD2d 52). Several examples from plaintiff's attorney's summation are illustrative of the type of prejudicial statements made by plaintiff's counsel that warrant reversal in this case:

"Forget [defense counsel], forget his face. [Counsel] is only a facade, that behind that facade is the real Seatrain, the real Seatrain, the one that killed Sergio Escobar, and the one who has done everything you've heard of from the witnesses in this courtroom for many years. That's the real Seatrain.

"I want you to put aside that nice, friendly, affable gentleman because that's not the contest. The decision is is Seatrain responsible and for how much. So forget the Madison Avenue seller.

"Now, for example, in the orient they have professional criers, professional mourners that come to every funeral and cry and apologize and feel sorry. [Counsel] is a professional mourner here that was sent here by Seatrain so you will forget the real face of Seatrain. The real face of the company that did this. [Counsel] is the facade.

"Now, the purpose of his nice, friendly, gentle affable presence is to make you forget. I want you to remember. I also want you to remember that he wouldn't allow any of us to tell you how Sergio died. * * *

"[Counsel] is the master of the half-truth, the inuendo *[sic],* what might be, what may be, what possibly could be, everything that's intended to raise the specter of doubt in your mind as to the realities that they killed him and its their obligation to pay."

After addressing similar conduct, the Appellate Division, Fourth Department stated, in words particularly applicable to counsel's conduct herein: "It is time that the bar should realize that when counsel in a close case resort to such practices to win a verdict, they imperil the very verdict which they thus seek * * * The misconduct was repeated. It cannot be deemed inadvertent or harmless." *(Cherry Cr. Natl. Bank v Fidelity & Cas. Co.,* 207 App Div 787, 791; *see also, Adams v Acker,* 57 AD2d 741, 742, *mod* 58 AD2d 754, *appeal dismissed* 42 NY2d 965, *lv dismissed* 42 NY2d 1050.) "When misconduct of counsel in interrogation or summation so violates the rights of the other party to the litigation that extraneous matters beyond the proper scope of the trial may have substantially influenced or been determinative of the outcome, such breaches of the rules will not be condoned." *(Kohlmann v City of New York,* 8 AD2d 598.)

In addition to the attacks on defense counsel, and improper references to matters dealing with liability, which issue was not before the court, plaintiff's counsel also introduced into evidence extensive prejudicial testimony with respect to mourning, grief and psychiatric problems experienced by decedent's widow and daughter, which may have been responsible for the inflated award of $2,000,000 for loss of society. In *Sea-Land Servs. v Gaudet* (414 US 573, 585, n 17), the Supreme Court held that although the widow and defendants of a deceased longshoreman are entitled to recover for loss of support, services (including nurture, training, education and guidance) and society, "[l]oss of society must not be confused with mental anguish or grief, which is not compensable under the maritime wrongful-death remedy."

Were we not reversing and remanding for a new trial on damages for the reasons stated above, we would have further reduced the awards (as reduced by the trial court) of $75,000 to each of decedent's two children, who were aged 19 and 20 at the time of his death. First, we reject defendant's contention that because EPTL 1-2.9-a reduced the age of majority from 21 to 18 years, the children were not entitled to recover anything. As noted in 1 NY PJI 2d 493 (1990 Supp), statutory authority continues to make parents responsible for their children's support to age 21 (Family Ct Act § 413 [1] [a];

Domestic Relations Law § 32 [3]). The law in New Jersey, where the children were domiciled, is not necessarily to the contrary (see, *Newburgh v Arrigo,* 88 NJ 529, 443 A2d 1031, 1037-1038).

Nevertheless, there was insufficient evidence to support a $75,000 award for nurture and care prior to age 21 of Gilda Morejon, who was six months short of her 21st birthday, and Sergio Escobar, Jr., who was one year and six months short of his 21st birthday at the time of decedent's death. (See, *Red Star Towing & Transp. Co. v Cargo Ship "Ming Giant",* 552 F Supp 367, 377-378 [SD NY 1982]; *De Centeno v Gulf Fleet Crews,* 798 F2d 138 [5th Cir 1986].) *Gonzalez v New York City Hous. Auth.* (77 NY2d 663), cited by the plaintiff, does not call for a contrary result. In *Gonzalez* there was considerable evidence of the nature and pecuniary value of the services rendered by decedent to her grandchildren at the time of her death, whereas in the instant case the evidence centered upon decedent's nurture and care of his children when they were very young, in Cuba and Spain.

We find that the trial court erred in refusing to permit cross examination of Dr. Mantell about the present value of the loss of decedent's future earnings. If there is a retrial on the issue of damages (i.e. if the parties cannot reach a reasonable settlement of this unconscionably long lawsuit), the ascertained future income and benefits that decedent would have received must be discounted to present value in making up the award, and since the lump-sum damages award is tax-free, the relevant stream of income that the damages award replaces should be calculated as after-tax wages and benefits (*Jones & Laughlin Steel Corp. v Pfeifer,* 462 US 523, 533-537). Social Security taxes shall also be deducted in computing future earnings, since the plaintiff should not be permitted to recover Social Security benefits the decedent would have received without taking into account the cost of those benefits (*Tallentire v Offshore Logistics,* 754 F2d 1274, 1287, *revd on other grounds* 477 US 207, *on remand* 800 F2d 1390, 1392).

With respect to the trial court's award of prejudgment interest, we agree that where the situs of the injury is on a vessel in navigable waters, whether the vessel is docked or under way, maritime law applies, and that in maritime cases the award of prejudgment interest is the rule, rather than the exception (*Helaire v Mobil Oil Co.,* 709 F2d 1031, 1042-1043 [5th Cir 1983]; *Webster v M/V Moolchand,* 730 F2d 1035, 1040 [5th Cir 1984]; *Barnett v Sea Land Serv.,* 875 F2d 741, 746-747 [9th Cir 1989]; *Taliercio ·v Compania Empressa Lineas,* 761

F2d 126, 129 [2d Cir 1985]; *see generally,* Annotation, *Award of Prejudgment Interest in Admiralty Suits,* 34 ALR Fed 126). Concur—Murphy, P. J., Carro, Wallach, Kupferman and Smith, JJ.