■ MONICA STEIDEL, Respondent, v COUNTY OF NASSAU,

Appellant.—In a medical malpractice action to recover damages for personal injuries, the defendant appeals from a judgment of the Supreme Court, Nassau County (Roncallo, J.), entered November 27, 1989, which, upon a jury verdict, is in favor of the plaintiff and against it in the principal sum of $5,048,924.

Ordered that the judgment is reversed, on the law, and as a matter of discretion, and a new trial is granted, with costs to abide the event.

On March 1, 1980, the plaintiff was admitted to Nassau County Medical Center to give birth to a child. At approximately 5:00 A.M., a first-year resident physician performed an amniotomy, that is, he artificially ruptured the plaintiff's fetal membranes. This first-year resident also ordered the placement of an internal electronic monitor. He left the labor room at approximately 5:03 A.M. Shortly thereafter, a nurse noted the occurrence of fetal heart decelerations and notified the first-year resident, who returned to the labor room at approximately 5:05 A.M.

The first-year resident confirmed the presence of fetal heart decelerations, which he knew could be caused by abnormally strong contractions, and continued for approximately one minute to examine the tracings of the fetal monitor in order to see if the decelerations would stop. The decelerations evidently continued, and the resident determined that an emergency Caesarean section was warranted. The evidence does not establish exactly when this decision was made; the decision was made as early as 5:07 A.M. or as late as 5:09 A.M.

Within approximately one minute, a second doctor confirmed the need for an emergency Caesarean section. The senior doctor ordered the procedure at approximately 5:10 A.M. Preparations for this surgery continued until approximately 5:15 A.M., at which time a Foley catheter was inserted. The plaintiff was brought into the operating room at 5:20 A.M., and the baby was delivered vaginally at 5:23 A.M.

After the baby was delivered, the plaintiff had a seizure. There is essentially no dispute that this seizure was caused by an amniotic fluid embolism. As a result of the seizure, the plaintiff suffered hypoxia and permanent brain damage.

The plaintiff's theory is that if the preparations for a Caesarean section had been speedier, the anaesthetic halothane would have been administered, and the administration of this drug would have averted the subsequent amniotic fluid embolism. In support of this theory, the plaintiff's expert

testified that several departures from good medical practice had occurred. He testified that, to begin with, it was malpractice to have had a first-year resident treat the plaintiff. He testified, in effect, that the delay attributable to the first-year resident's need to obtain confirmation of his judgment from a more senior doctor represented malpractice.

This witness also testified that a "departure from appropriate medical practice" was reflected in the delay between approximately 5:10 A.M., when a senior doctor ordered the immediate Caesarean section, and 5:15 A.M., when a Foley catheter was inserted. This witness similarly characterized as a "departure from appropriate obstetric practice" the fact that there was an additional four or five minute delay between 5:15 A.M. and 5:20 A.M., when the plaintiff entered the operating room.

The plaintiff's expert witness also testified that, in his opinion, the anaesthetic halothane should have been administered "immediately", and that the failure to administer this drug "immediately" was a departure from good medical practice. One can only surmise that the witness's opinion is that halothane should have been administered between 5:05 A.M. and 5:07 A.M., that is, as soon as the fetal heart decelerations were first noted by a nurse and when the presence of fetal heart decelerations and strong contractions was confirmed by a doctor. However, this witness's testimony is not precise as to just how "immediate" the administration of halothane should have been.

With respect to causation, this witness was permitted to testify, over objection, that, in his opinion, "each of [the several departures, including those noted above] in and of themselves [were] causally related to the brain damage [ultimately suffered by the plaintiff]". The defendant's attorney repeated his objection and, upon further interrogation by the court, the plaintiff's expert stated that "[m]y opinion is that * * * tetanic uterine contractions are oftentimes [the] precursor of amniotic fluid embolism which can cause severe brain damage".

The plaintiff's attorney then resumed his examination on the issue of causation, asking his witness whether the "appropriate medical practice that you described to the jury here this morning [was] to avoid just the type of thing that occurred here?" The witness responded affirmatively. Later, on redirect examination, the plaintiff's expert testified that it would be reasonable to "associate" the occurrence of an amni-

otic fluid embolism, on the one hand, with tetanic uterine contractions experienced during labor, on the other.

In its charge, the trial court did not itemize for the jury any of the several alleged departures which the plaintiff's expert testified had occurred and failed to submit a verdict sheet which would have allowed the jury to pass judgment on each of these separate allegations. Since the jury was not instructed to identify any alleged departure, it was obviously not called upon to define which departure or departures caused the injuries. In fact, the jury was not asked to decide the issue of causation at all. Because of the inadequacies noted above, the jury's verdict as to liability consists of the following statement: "We find for the plaintiff Monica Steidel".

We conclude that the judgment under review must be reversed because the jury verdict may have been based upon a theory of liability which is unsupported by legally sufficient evidence. As noted above, the plaintiff's expert identified several discrete "departures", that is, several overlapping instances of malpractice. While it is true that all of these "departures" related to the delay in administering halothane, the fact remains that the plaintiff's attorney elicited testimony which suggested to the jury that the defendant, by its agents, was negligent with respect to the following six acts or omissions: (1) allowing a first-year resident to be the sole person involved in the initial evaluation of the plaintiff, (2) delaying the emergency Caesarean section for the time it took (between 5:05 A.M. and 5:07 A.M.) for a nurse to notify the first-year resident and for the resident to notify the senior doctor, when a nurse could have notified the senior doctor directly, (3) delaying the emergency Caesarean section for the time it took (between 5:07 A.M. and 5:10 A.M.) for the first-year resident and the senior doctor to make a decision, (4) delaying the emergency Caesarean section for the time it took (between 5:10 A.M. and 5:15 A.M.) to prepare for the procedure, (5) delaying the emergency Caesarean section for the additional time it took (between 5:15 A.M. and 5:20 A.M.) to get the plaintiff to the operating room, and, finally, (6) failing to administer halothane "immediately" (the point in the chronology outlined above to which "immediately" applies was never clarified).

There is no dispute that a certain amount of time elapsed between when the decision to perform a Caesarean section was, or should have been made, on the one hand, and when the plaintiff was wheeled into the operating room, on the

other. The question to be decided by the jury was whether *all* of that delay, or any part of it, was attributable to negligence. As a result of the plaintiff's experts having identified several "departures", the jury could have found that *all* of the delay was attributable to negligence or that only some part of it (as little as two or three minutes) was attributable to negligence. The record does not adequately demonstrate that the plaintiff would not have suffered the embolism had halothane been administered, for example, at 5:20 A.M.

Where, at the plaintiff's own request, there has been a general verdict, a new trial must be ordered whenever it appears that one of several theories submitted to the jury is not supported by legally sufficient evidence, even if other theories were supported *(Davis v Caldwell,* 54 NY2d 176; *Clarke v City of New York,* 175 AD2d 458; *Duffey v Fear,* 121 AD2d 928; *Mertsaris v 73rd Corp.,* 105 AD2d 67). What this means in practical terms is that a plaintiff's attorney who is not content to advance one single theory of malpractice, as could have been done in this case (e.g., by asserting simply that it was malpractice to fail to administer halothane within a specified time after the onset of fetal distress), but who chooses instead to advance several overlapping theories of malpractice so as to impress the jury that the defendant committed not one, but several, discrete "departures", must have the case decided by a jury which is given an appropriate charge, which was not done in this case.

Review of this issue in the present case is warranted even if the defense counsel may have failed, by making the appropriate objection, to delineate with sufficient clarity the need for separate interrogatories relating to each of the several theories of liability advanced by the plaintiff. A general verdict as to liability leaves the reviewing court with no clue as to which theory of liability the jury adopted. The Appellate Division has, therefore, repeatedly condemned the use of general verdicts in cases where the plaintiff seeks recovery on several different theories *(e.g., Matter of Evanchuk,* 145 AD2d 559; *Kenigsberg v Cohn,* 117 AD2d 652; *Mertsaris v 73rd Corp., supra).* In *Russo v Jess R. Rifkin, D.D.S., P.C.* (113 AD2d 570, 572), Justice Lazer wrote that "in this era of complex issues * * * the necessity that appellate bodies be provided with some illumination of the jury's rationale has been rendered quite acute." The passage of time has rendered only more acute the need for special verdicts described by Justice Lazer in the *Russo* case *(supra).* The complexity of a jury charge, and the precision of the special verdict, should match the

complexity of the medical issues on trial. The charge in this case was palpably inadequate.

Reversal is also warranted because the plaintiff's attorney made several unfair comments during the course of his summation. If this were a case where liability had been shown with any degree of clarity, these improper remarks probably would have been attributed to excessive zeal and forgiven as harmless. But in a case where the plaintiff has produced an expert witness who is unconvincing at best, it was particularly unbecoming for the plaintiff's attorney to suggest that it was the defendant's expert who was "shading the truth", or to accuse the defendant's expert of being the "hired gun". Counsel's remark that the defendant's expert's "idea of truth and justice is that this is a game to be played" was likewise improper. " 'When misconduct of counsel in * * * summation so violates the rights of the other party to the litigation that extraneous matters beyond the proper scope of the trial may have substantially influenced or been determinative of the outcome, such breaches of the rules will not be condoned' " (*Escobar v Seatrain Lines*, 175 AD2d 741, 744, quoting *Kohlmann v City of New York*, 8 AD2d 598).

For the foregoing reasons, the judgment appealed from is reversed, on the law, and as a matter of discretion, and a new trial granted. Thompson, J. P., Bracken, Harwood and Copertino, JJ., concur.