■ In the Matter of STATE OF NEW YORK, Respondent, v ANDREW O., Appellant. [890 NYS2d 667]—

Peters, J.P.

In 1986, respondent pleaded guilty to one count of sexual abuse in the second degree arising out of an incident involving his then five-year-old adopted daughter. He was sentenced to three years of probation and ordered to vacate the family residence and participate in therapy. Over one year later, respondent was permitted to return to his residence. Within just one month, and despite being on probation, respondent again began sexually abusing the child. He was later arrested and, in June 1988, convicted upon his plea of guilty of one count of sexual abuse in the first degree and sentenced to a prison term of $2^1/_3$ to 7 years. In August 1992, after serving four years in prison, respondent was released on parole. A parole violation warrant was issued in March 1993, charging respondent with violating the conditions of his parole by, among other things, establishing a romantic relationship with a woman who had a two-year-old daughter, failing to notify his parole officer of this fact and providing false information to the parole officer regarding the relationship. Following a hearing, respondent's parole was revoked and he was reincarcerated until May 1994. Approximately one year after his release, respondent moved in with the same woman with whom he had established a relationship while on parole, as well as her minor daughter. During the summer of 1998, respondent sexually abused the daughter. Following a written statement made to police, he pleaded guilty to one count of sexual abuse in the first degree in full satisfaction of a multicount indictment and was sentenced to seven years in prison to be followed by five years of postrelease supervision.

In August 2007, petitioner filed a petition seeking an order authorizing respondent's civil management pursuant to Mental

Hygiene Law article 10. The proceeding was thereafter removed to Saratoga County (*see* Mental Hygiene Law § 10.06 [b]) and, following a hearing, Supreme Court (Ferradino, J.) found that there was probable cause to believe that respondent was a sex offender requiring civil management (*see* Mental Hygiene Law § 10.06 [g], [k]; § 10.03 [q]) and ordered that he be transferred to the custody of the Office of Mental Health. A jury trial was subsequently held, at the conclusion of which the jury determined that respondent suffers from a "mental abnormality" as defined under Mental Hygiene Law article 10 (Mental Hygiene Law §§ 10.07, 10.03 [i]). Following a bench trial, Supreme Court (Seibert, J.) found respondent to be a dangerous sex offender requiring confinement and committed him to a secure treatment facility (*see* Mental Hygiene Law § 10.07 [f]; § 10.03 [e]). He now appeals.

Respondent first contends that the jury's determination that he suffers from a mental abnormality is against the weight of the evidence. Pursuant to Mental Hygiene Law article 10, a "mental abnormality" is defined as "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct" (Mental Hygiene Law § 10.03 [i]; *see State of N.Y. ex rel. Harkavy v Consilvio*, 8 NY3d 645, 651 n 2 [2007]).

At trial, petitioner presented the expert testimony of Christine Rackley, a psychiatrist and member of the Office of Mental Health's case review team, and Roger Harris, a forensic psychologist. Based upon their independent interviews with respondent and review of his case summary, parole reports, and prison, criminal and sex offender records, both Rackley and Harris concluded that respondent suffers from a "mental abnormality" as defined under Mental Hygiene Law article 10. Both also stated that, in making such a determination, they do not rely upon the results of any actuarial risk assessments (hereinafter ARAs), such as the STATIC-99,[1] since the professional community uniformly views the STATIC-99 and other ARAs as having little, if any, role in determining whether an individual suffers from a mental abnormality. Rather, according to both Rackley and Harris, the professional community examines the offender's past behavior.

---

1. The STATIC-99 is made up of 10 "yes or no" questions based upon specific characteristics of an individual's underlying sex offenses. It is designed to measure an individual's risk of being convicted of a future sex offense based on empirical data gathered from a large group of sex offenders.

In that regard, Rackley explained that one's ability to control his or her behavior is generally measured by how such person responds and adapts after suffering sanctions as a result of his or her conduct. She found that, given that respondent has sexually reoffended twice since his initial 1986 conviction, his inability to abide by parole conditions and discharge from a sex offender treatment program while incarcerated, respondent has a serious difficulty controlling his pedophile predilections. She also noted that respondent externalized the blame for his offenses and minimized the severity of his conduct—claiming that the children's mothers made him feel inadequate and deprived him of sex, that he had asked the victims if it was okay for him to touch them and, in one situation, told the victim to tell her mother if he did it again—conduct which further evinced his inability to control his sexual impulses.

Harris testified that respondent suffers from both pedophilia and antisocial personality disorder,[2] and that his conduct has repeatedly demonstrated that his sexual arousal from prepubescent females clearly affects his cognition and ability to control his behavior. Harris stated that, in spite of the repercussions for sexually reoffending, respondent was convicted of multiple sex offenses, violated probation and parole, failed to succeed in a sex offender treatment program and indicated to parole officers that he would not abide with conditions—specifically stating that he would "live [his] life the way [he] want[s] to" and would violate "if they hound the s. . . . out of [him] again." Like Rackley, Harris opined that respondent repeatedly deflected the responsibility for his conduct onto the mothers of the victims, outside influences and the victims themselves and rationalized his behavior despite his recognition that his conduct was wrong. Harris also found it highly significant that, after respondent returned following his removal from his home and family, he could not prevent himself from sexually reoffending against his adopted daughter, even going to the extreme measures of slipping the latch on her door (which respondent's then wife installed in order to prevent respondent's access) on multiple occasions in order to gain access to her, and abusing her on other occasions despite the presence of an adult babysitter in the house. Indeed, even after serving four years in prison, respondent continued to sexually reoffend.

Respondent presented the expert testimony of Daniel Krieg-

---

**2.** Harris explained that antisocial personality disorder is a condition where individuals evince a pattern of behavior establishing their disregard for society's rules, laws and/or other people and is often indicated by impulsivity, lying and manipulation.

man, a licensed psychologist with extensive experience in treating and diagnosing sex offenders in Massachusetts. While licensed in Massachusetts, Kriegman was not licensed in New York, had testified solely for the defense for over a decade, and had never testified in a Mental Hygiene Law article 10 proceeding in New York. Although he agreed that respondent met the criteria for a diagnosis of pedophilia, Kriegman opined that there is no evidence that respondent is currently predisposed to commit a sex offense. Contrary to the testimony of petitioner's experts, Kriegman testified that a person's predisposition is best determined through the use of ARAs such as the STATIC-99. Kriegman scored respondent as a 3 on the STATIC-99, indicating a moderate to low risk of reconviction, and classified him as an "incest offender" because he lived in a family unit with each of his victims. Given these findings and respondent's age, Kriegman found that statistically there was only a five percent rate of recidivism. Kriegman acknowledged that respondent denied and minimized his conduct, was removed from sex offender treatment and told the probation officer that he would not abide by conditions, yet opined that the likelihood of reoffense was not affected by these facts. He ultimately concluded that respondent does not suffer from a mental abnormality as that term is defined under Mental Hygiene Law article 10.

While respondent argues that Kriegman's opinion should have been accorded more weight than those of Harris and Rackley, "[t]he trier of fact is in the best position to evaluate the weight and credibility of conflicting expert medical and psychiatric testimony" (*Matter of State of New York v Donald N.*, 63 AD3d 1391, 1394 [2009]; *see Matter of George L.*, 85 NY2d 295, 305 [1995]; *Matter of State of New York v Shawn X.*, 69 AD3d 165, 168-169 [2009]). To that end, we find it significant that, during cross-examination, Kriegman acknowledged that his Mental Hygiene Law article 10 evaluation report, which formed the basis of his opinion and which he had edited 30 to 40 times, contained numerous errors and omissions. For example, such report incorrectly stated the year in which respondent sexually abused his girlfriend's daughter and the length of time that respondent was removed from his residence after he first offended against his adopted daughter. Kriegman admitted that, had he known that respondent was actually removed from his residence for over one year and had been home for only a month before he reoffended, it would have been significant in relation to respondent's ability to control his urges. Moreover, Kriegman's report failed to contain any mention of the fact that respondent slipped the lock on his

daughter's door in order to gain access to her. Not insignificantly, Kriegman was also confronted with his expert testimony in a prior case wherein he opined that "when offenders don't learn from more than a year in prison, I consider that a sign of persistence . . . [and that] they clearly haven't learned anything." Thus, upon our review of the record as a whole, and according deference to the jury's credibility determinations, we find no basis upon which to disturb its determination that petitioner proved, by clear and convincing evidence, that respondent suffers from a mental abnormality.

Respondent next asserts that he was deprived of a fair trial due to Supreme Court's erroneous evidentiary rulings and misconduct on the part of petitioner's counsel. Initially, we agree that counsel's inquiry of Kriegman on cross-examination regarding Yoism, a religion he had founded, was improper (*cf. People v Wood*, 66 NY2d 374, 378 [1985]). While we fully join in the dissent's recognition that interjection of a party's religious beliefs or observances has no place in either a criminal or civil trial, we cannot agree with its conclusion that a new trial is warranted in this case. Although petitioner's counsel briefly questioned Kriegman regarding his founding of Yoism and its beliefs, the balance of counsel's extensive cross-examination, as previously described, severely undermined Kriegman's credibility as well as the factual basis for his opinion that respondent suffered a mental abnormality. In light of this, we conclude that the objectionable questioning regarding Yoism, within the context of the entire trial, did not substantially influence the jury's verdict (*see Biello v Albany Mem. Hosp.*, 49 AD3d 1036, 1038 [2008]; *Price v New York City Hous. Auth.*, 244 AD2d 186, 186 [1997], *affd* 92 NY2d 553 [1998]). With respect to petitioner's summation, although certain comments made by counsel were improper, Supreme Court sustained respondent's objections thereto and provided limiting instructions to the jury, thus mitigating any harm to respondent (*see Hitchcock v Best*, 247 AD2d 769, 769 [1998]). Further, the challenged remarks represented only a small portion of counsel's lengthy summation and were not sufficiently egregious, either alone or in the aggregate, to "permeate[ ] the trial and create[ ] a climate of hostility that effectively destroyed [respondent's] ability to obtain a fair trial" (*DiMichel v South Buffalo Ry. Co.*, 80 NY2d 184, 198 [1992]; *see Hitchcock v Best*, 247 AD2d at 769; *Rohring v City of Niagara Falls*, 192 AD2d 228, 230-231 [1993], *affd* 84 NY2d 60 [1994]; *compare Berkowitz v Marriott Corp.*, 163 AD2d 52, 53-54 [1990]).

Addressing respondent's claims of evidentiary error, we first

find that his records from the Division of Criminal Justice Services and the Board of Examiners of Sex Offenders were properly admitted as certified business records (*see* CPLR 4518 [c]). Next, inasmuch as respondent stipulated to the admission of his sex offender treatment records, he cannot now argue that Rackley should not have been permitted to describe their contents for purposes of explaining the basis of her opinion. Lastly, Supreme Court did not err in permitting Rackley to communicate the contents of a sworn statement made by a 14-year-old girl regarding an alleged sexual incident involving respondent. Rackley's hearsay testimony in this regard was "for the limited purpose of informing the jury of the basis of [her] opinion and not for the truth of the matters related" (*O'Brien v Mbugua*, 49 AD3d 937, 938 [2008] [internal quotation marks and citation omitted]), and her expert opinion, although partly based upon this out-of-court statement, was not rendered inadmissible since this 14-year-old girl was subsequently called as a witness and cross-examined regarding that very incident and her sworn statement (*see Hambsch v New York City Tr. Auth.*, 63 NY2d 723, 726 [1984]; *People v Sugden*, 35 NY2d 453, 461 [1974]; *Brown v County of Albany*, 271 AD2d 819, 820 [2000], *lv denied* 95 NY2d 767 [2000]).[3] Contrary to respondent's assertions, the fact that he was never criminally charged with conduct concerning this 14-year-old neither renders the testimony unduly prejudicial nor any less relevant to the issues to be determined at trial (*see Matter of State of New York v Shawn X.*, 69 AD3d at 171-172; *Matter of State of New York v C.B.*, 23 Misc 3d 1130[A], 2009 NY Slip Op 51010[U], \*3 [2009]).

Turning to the dispositional phase of the trial, respondent contends that petitioner failed to prove by clear and convincing evidence that he is a "dangerous sex offender requiring confinement." Specifically, he asserts that his expert witness was most credible and that, based upon his STATIC-99 score and the nature of his pedophilia, imposition of a regimen of strict and intensive supervision and treatment (hereinafter SIST) is a more appropriate disposition. Under Mental Hygiene Law article 10, a "dangerous sex offender requiring confinement" is defined as "a person who is . . . suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is

---

3. When called as a witness, the girl testified that she did not recall anything in her statement other than the fact that respondent asked her whether she "played with [her]self." As a result, Supreme Court thereafter limited the experts' use of the sworn statement to those very facts.

likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (Mental Hygiene Law § 10.03 [e]; *see Matter of State of New York v Donald N.*, 63 AD3d at 1393).[4]

At the bench trial, Supreme Court heard testimony from the same three experts who presented testimony at the jury trial. Both Rackley and Harris opined that, based upon their initial evaluation and the testimony adduced during the jury trial, respondent is a dangerous sex offender requiring confinement. Rackley explained that sex offenders who take responsibility for their behavior and accept their disorder have a much better ability to control their sexual urges than those, like respondent, who do not. Rackley noted that respondent has a strong compulsion to act on his pedophilic urges as evinced by the fact that he managed to undo the lock on the bedroom door of one of his victims in order to gain access to her and reoffended time and time again, despite significant repercussions such as his incarceration, loss of parole and the dissipation of his first marriage. She further opined that, although respondent's current term of five years of postrelease supervision would typically help mitigate an offender's potential sexually offending behavior in the future, respondent's explicit statements that he would not let parole control his life, would not abide by their rules, will "live [his] life the way [he] want[s] to" and would violate "if they hound the s. . . out of [him] again" indicate that he is going to be extremely difficult to supervise and that the community is going to remain at risk.

For many of the same reasons, Harris agreed that respondent is a dangerous sex offender and a "poor candidate" for SIST. Harris also disagreed that respondent is an "incest offender" who, based on his age, is statistically unlikely to reoffend. He explained that an incest offender typically offends within the confines of one family unit, thus explaining their low rate of recidivism. According to Harris, respondent is in a different category, instead traveling from family to family looking for vulnerable women with young children who he then sexually assaulted. He also expressed serious concerns over respondent's "grooming" of the then-14-year-old female, because she was both outside the family and age group of the victims against whom he previously offended.

---

4. If a court finds that a respondent is not a dangerous sex offender requiring confinement, "then the court shall make a finding of disposition that the respondent is a sex offender requiring [SIST], and the respondent shall be subject to a regimen of [SIST] in accordance with [Mental Hygiene Law § 10.11]" (Mental Hygiene Law § 10.07 [f]).

To the contrary, Kriegman opined that respondent could reside safely in the community under a regimen of SIST. As he had at the jury trial, Kriegman testified that respondent is an incest offender who offends only against children in his family and, thus, found it "impossible to imagine" a scenario under which respondent could recidivate while released under SIST. Recognizing these divergent opinions, we again accord deference to the factual determinations of the trier of fact due to its superior ability to evaluate the weight and credibility of the psychiatric testimony (*see Matter of George L.*, 85 NY2d at 305; *Matter of State of New York v Donald N.*, 63 AD3d at 1394). Given the compelling testimony that respondent fails to appreciate that he has a problem, his pattern of offending and reoffending, his determination to overcome access obstacles, and his acknowledged intent to act as he pleases and violate the conditions of his parole, we agree that respondent suffers from a mental abnormality manifested by a strong disposition to commit sexual offenses and that his inability to contain his behavior presents an unacceptable risk of danger to the community (*see* Mental Hygiene Law § 10.03 [e]; *Matter of State of New York v Donald N.*, 63 AD3d at 1394).

Respondent's remaining contentions, to the extent not specifically addressed herein, have been fully reviewed and found to be unavailing.

Spain, Kane and Stein, JJ., concur.

Rose, J. (dissenting). I respectfully dissent. Despite repeated objections from respondent's counsel, Supreme Court allowed petitioner's counsel to extensively question psychologist Daniel Kriegman regarding his religious beliefs and affiliation with a particular religion. Counsel asked, among other things, whether Kriegman's religion is an on-line religion, whether he had founded it and whether any sports stars were considered to be saints, thereby emphasizing its differences from the religions with which the jurors would likely have been familiar. Even though this questioning was patently irrelevant to any issue in the proceeding, petitioner's counsel cited it as an important part of Kriegman's life experience and repeatedly stressed that it played a role in his professional opinions. Such questioning can only be viewed as an improper attempt to challenge Kriegman's credibility based upon his religious beliefs and such a tactic has no place in either a civil or a criminal trial (*see People v Wood*, 66 NY2d 374, 378 [1985]; *Toomey v Farley*, 2 NY2d 71, 82 [1956]; *People v Caba*, 66 AD3d 1121, 1123 [2009]; *Giuamara v O'Donnell*, 96 AD2d 1049, 1051 [1983]; *Saunders v Champlain Bus Corp.*, 263 App Div 683, 684 [1942]; *Bowen v Mahoney Coal*

*Corp.*, 256 App Div 485, 485-486 [1939]). In addition, because Kriegman's testimony was central to respondent's defense to the grounds for civil confinement presented by petitioner, I cannot agree with the majority that this error could not have substantially influenced the jury's verdict. Accordingly, I would reverse Supreme Court's order and remit the matter for a new jury trial.

Ordered that the order is affirmed, without costs.