■ David Caraballo, an Infant, by His Father and Natural Guardian, Efraim Caraballo, et al., Respondents, v City of New York, Defendant, and

NEW YORK CITY HOUSING AUTHORITY, Appellant. — Judgment, Supreme Court, New York County (Pecora, J.), entered September 18, 1980, on jury verdict, in favor of plaintiff, is reversed, on the law and the facts, and a new trial is ordered, without costs. We are compelled to reverse this judgment because of the grossly improper and inflammatory summation by plaintiffs' attorney, Mr. Raymond B. Schwartzberg. The summation had as its continuing theme a personal attack on defendant-appellant's attorney, unsubstantiated charges of perjury and subornation of perjury; racial overtones; and assertions of personal knowledge and personal opinion as to the case and the credibility of witnesses. Among the things that plaintiffs' attorney said in his summation were: "this clever lawyer has been jabbing and moving around for two weeks with illegal procedures"; "[h]e is a tricky lawyer"; "he is skilled, experienced, tricky, deceptive, and that is what this is really all about, and that is what is happening here"; "and the only thing you do is give cleverer and perhaps evil adversary opportunity to twist people around in their words [explaining plaintiff's failure to call some witnesses]." He further said, "They will say anything to beat this case because, ladies and gentlemen, there's a lot of money involved here." "They bring in a phony doctor for a price". "He said yes, there will be a bill. How much do you charge for perjury, doctor?" "What is so great and exclusive about Manhattan Hospital where the doctors come down for a price and lie to you for a lawyer for a Housing Authority for a price, a price they wouldn't tell you." Combining charges of perjury and subornation of perjury with racial overtones, he said, "He brought in that poor black man. They put him up to coming here. They used him." "He didn't do it from pressure like that poor black man did, didn't do it for that. He did it for money." Adding to these the statements of his personal knowledge of the facts and his personal opinion as to the justness of his cause and the credibility of witnesses, in violation of DR 7-106(C) (3), (4) of the Code of Professional Responsibility, he said, "I forgive the black man, the person, I forgave him, but I cannot forgive Dr. Lisman, Emeritus for coming in and lying to you, and you know how I knew it? I smelled it because I said to him name one." Referring to a valid and required assertion of physician-patient privilege, he said, "[W]hen this lawyer yelled privilege, I knew that was a lie". Referring to a former drug addict witness for plaintiffs, he said, "I would invite him to my home for dinner. I see nothing wrong with him." Also: "I am familiar with Dr. Budabin and his reputation as an eminent neurologist". "[H]old your hats because I have a figure. I know what these cases are worth." In *Cohen v Covelli* (276 App Div 375, 376), this court said: "A wide latitude is allowed to counsel in his summation and we have no desire to curb a vigorous, robust summation. A witness may be characterized as untruthful, as a falsifier, as a liar, and even as a perjurer. That is a matter of propriety, of good taste and of judgment, with which a court will not interfere. But there is some line to be drawn. Where, therefore, a lawyer, in his summation, charges that a witness testifying to material facts in a case has been 'bought' by the other side, when there is no basis in the evidence for any such charge, that statement is so highly objectionable and prejudicial as to require a new trial in a case involving sharply contested issues, particularly when the objectionable statement complained of was allowed to stand without prompt judicial rebuke." In this and in the other respects noted, the summation for plaintiffs in the present case went far beyond the permissible line. We do not agree with our dissenting brother that there were adequate and effective curative instructions or admonitions by the court. We are unable to say that this inflammatory improper summation did not influence the jury's verdict. Accordingly, we cannot let the verdict stand, and we order a new trial. Concur — Lupiano, Silverman and Bloom, JJ.

Birns, J. P., and Fein, J., dissent in a memorandum by Fein, J., as follows: The seven-year-old infant plaintiff left his apartment building at 20 Catherine Slip in Manhattan in advance of the rest of his family, to hop and skip ahead. The family was on its way to church on this Sunday evening in February, 1977. The child slipped on the icy pavement and fell against a perimeter fence maintained by defendant New York City Housing Authority, impaling his left eyelid on a six- to seven-inch barbed wire protrusion. The testimony was that this dangerous condition had existed for about 9 or 10 months. The child suffered a severe and painful "through and through" laceration, requiring three operations at New York Eye and Ear Infirmary over a 21-month period. He was left with a 70% traumatic ptosis (drooping) of the eyelid due to depressed lavator (muscular) function, resulting in impairment of vision to the extent of loss of the superior (upper) 50% range of view. He cannot see straight forward or upward, and can only look downward. In other words, he can only see half of what he had been able to see without the drooping eyelid. He is also disfigured by cystic granuloma (knobbing of the tissue) from the scars of the operations. The ptosis apparently could not be corrected by the surgical procedures, and plaintiffs' medical expert described this condition as "permanent". Defendants' medical expert, an ophthalmic surgeon, suggested the availability of a common and "very effective" operation called "Frontalus suspension", whereby the upper lid is sutured to the eyebrow so that "when the patient elevates his brow his lid comes up and you can uncover all or much of the pupil you want." He added that this plastic surgical procedure is generally indicated for patients as to whom ptosis operations have failed. Defendants' medical expert's predictions for success as a result of this surgical procedure were optimistic. The doctor testified that at his hospital, Manhattan Eye and Ear Hospital, 15 to 20 frontalus suspensions were performed under his supervision each year, "ten or 12 of them already" by August of that year, and all were successful. Plaintiff introduced hospital records revealing that only two such operations designated as "frontalus suspensions of an eyelid ptosis" had been performed at Manhattan Eye and Ear Hospital in the year and one half preceding the trial. On this basis, on summation plaintiffs' counsel unleashed a vitriolic attack on defendants' medical expert. We are all agreed that the evidence was sufficient to establish proximate cause. In this case the infant plaintiff's fall against the fence resulted from a normal activity, unlike the unusual and inherently dangerous act of the plaintiff child in *Rivera v City of New York* (11 NY2d 856) where the complaint was dismissed. There the child was scalded falling into a bathtub of hot water after balancing precariously in his boots on the curved edge of the tub, trying to reach a light cord. Rather, this case is more akin to *Pagan v Goldberger* (51 AD2d 508), where the child was injured in a fall upon a sharp radiator part, left exposed by the landlord. Here, defendant landlord could reasonably expect that falls of infants or even adult residents normally happen. To leave a six- to seven-inch wire protrusion exposed, so that a person falling, under these circumstances, would be in a position to sustain injury, constitutes conduct which a jury could "find to be negligent, and the negligence so found to be so directly connected with the injury that the requirement of proximate cause is satisfied" (*Pagan v Goldberger, supra,* at p 512). The lesson of *Pagan* is that such questions of proximate cause and foreseeability are properly reserved for the jury to deliberate and determine (see *Bland v Kaufman,* 249 App Div 842). We are all also agreed that the evidence was sufficient to sustain the amount of the verdict ($225,000 for the child, $3,000 for his father), in light of the serious nature of the infant plaintiff's injury. We differ only as to the extent of the prejudicial effect of plaintiffs' counsel's plainly inappropriate summation. It goes without saying

that inflammatory conduct on the part of a trial attorney in a close case may warrant a new trial. By the same token, prejudicial remarks can, in the context of a given case, be insignificant where the record adequately supports the jury's verdict (*Moore v Town of Huntington,* 39 AD2d 764). It is notable that in *Moore* the Trial Judge set the verdict of the jury aside, but the Second Department reinstated the verdict. Here an experienced Trial Judge promptly gave proper instructions and declined to grant a mistrial or to set the verdict aside. We should follow his lead. In *Reilly v Wright* (55 AD2d 544) we ruled that even where the case is close enough for the verdict to have gone either way, it does not necessarily follow that "grossly improper" conduct on the part of the trial counsel will prevent careful consideration of the evidence by the jury or unduly influence its verdict. This court there emphasized the weight to be given to the views of the Trial Judge. The "experienced Trial Justice was in a more favorable position than we are to gauge the effect of [the attorney's] misconduct." (55 AD2d, p 545.) In *Cohen v Covelli* (276 App Div 375, 376), relied upon by the majority, the problem, at least in part, was that "the objectionable statement complained of was allowed to stand without prompt judicial rebuke." Not so here. The Trial Judge ruled properly, promptly and effectively. He rebuked counsel where appropriate and advised and charged the jury to disregard counsel's improper remarks. Even in a criminal case, where the problem is obviously of greater magnitude, such judicial interposition has been held sufficient to sustain a conviction despite the prosecutor's misconduct similar to the conduct here involved (*People v Galloway,* 54 NY2d 396). The conduct of plaintiff's trial counsel is not to be condoned. However, the issues here were defined clearly enough, and the evidence was plainly sufficient for the jury to have reached the verdict it did. Under such circumstances it would be a waste of judicial resources to remand this cause for a new trial. Moreover, it would punish an infant child for the lawyer's misconduct (cf. *People v Galloway, supra*). The judgment, Supreme Court, New York County (Pecora, J.), entered September 18, 1980 on a jury verdict in favor of the plaintiffs against the New York City Housing Authority, should be affirmed.