Rose Clarke, as Administratrix of the Estate of James Clarke, Deceased, et al., Respondents, v New York City Transit Authority, Appellant.

First Department, January 30, 1992

## APPEARANCES OF COUNSEL

*Bernard S. Meyer* of counsel *(Aaron J. Broder* and *Michael A. Ciaffa* with him on the brief; *Meyer, Suozzi, English & Klein, P. C.,* and *Aaron J. Broder, P. C.,* attorneys), for respondents.

*Lawrence A. Silver* of counsel *(Lawrence Heisler* and *Anita Isola* with him on the brief; *Albert C. Cosenza,* attorney), for appellant.

Ross, J.

In this personal injury action, involving two homeless men, defendant, New York City Transit Authority, appeals from a judgment, entered after a jury verdict in favor of the plaintiffs, and alleges, *inter alia,* trial court errors, as to evidentiary rulings and as to the court's charge, and a prejudicial summation by plaintiffs' trial counsel.

Shortly after 2:00 P.M., on March 6, 1986, approximately 30 to 60 feet north of the north end of the subway platform of the Broadway-Lafayette subway station, New York County, two men, later identified as Messrs. James and Earl Clarke, were found on the ground near the third rail of the subway tracks. The Aided Report indicates that the two were injured when they "touched the third rail", and that this information was obtained from Mr. Earl Clarke. At the Burn Center Earl Clarke was given "Narcan", to relieve drug-induced withdrawal symptoms and admitted that he had used heroin on the day of the accident.

Messrs. James and Earl Clarke were brothers, and, after being discovered on the tracks, they were taken to the Cornell Burn Center of New York Hospital (Burn Center) for treatment. While Mr. James Clarke suffered second and third degree burns over 30 to 35% of his body, resulting in severe facial and body scarring, and the loss of hearing in his left ear, Mr. Earl Clarke suffered burns to 15% of his body, mostly in the area of the chest and arms.

Subsequently, in August 1986, Messrs. Clarke (plaintiffs) commenced a personal injury action against the New York City Transit Authority (defendant) to recover damages for their injuries, based upon defendant's alleged negligence.

On February 16, 1987, Mr. Earl Clarke died, from causes unrelated to this accident, and his estate continued this action.

At the trial, Mr. James Clarke testified, as the sole eyewitness to the accident. He stated, in substance, that his brother and he were standing on the north end of the Broadway/Lafayette subway platform waiting for the uptown F train, when he thought he heard a train, "so I had stepped forward and while I was stepping forward I was looking to the right * * * and I stepped onto some garbage. I didn't see it but I ended up on the tracks". According to his testimony, the subject garbage was in close proximity to an overflowing

dumpster located at the end of the platform where his brother and he were standing, and same looked like it had been "swept together".

Further, Mr. James Clarke stated that, after he fell to the tracks, since he thought that he heard a train coming, he panicked and ran into the tunnel. Thereafter, he testified, his brother jumped down to the tracks in an effort to rescue him, and the last thing the witness remembered was falling down again, and "I felt something hot going all through my body".

Mr. James Clarke testified that during the three years prior to the day of the accident, from time to time, he had slept in the station with other homeless men, and, in fact, the night before, he had slept two or three hours on the southbound platform. Further, he admitted that, at "a little after 7:00 in the morning" of the incident, he shared a bottle of wine with two other men.

Witnesses for the defendant, including Transit Police officers, testified that, *inter alia,* blankets, sheets, and drug paraphernalia, consisting of "some candles, a cooker, a hypodermic needle and syringe", were scattered around in the area of the tracks where Messrs. James and Earl Clarke were found.

After hearing the evidence, the summations, and the charge, the jury returned a verdict in favor of the plaintiffs and against defendant. The jury verdicts as to Mr. James Clarke were $7,500,000 for past pain and suffering, $250,000 for future pain and suffering, $133,000 for past medical and hospital expenses, $329,000 for future medical and hospital expenses, $9,000 for past loss of earnings, and no future loss of earnings, and as to Ms. Victoria Clarke, as administratrix of the estate of Mr. Earl Clarke, were $5,000,000 for pain and suffering up to the time of his death in February 1987, $64,000 for medical and hospital expenses up to the time of his death, and $1,000 for loss of earnings up to the time of his death.

In response to the defendant's posttrial motions to set aside the verdict, for a directed verdict in its favor, and to set aside the verdict awards as excessive, the trial court granted those motions only to the extent of reducing the verdict of $7,500,000 for past pain and suffering of Mr. James Clarke to $3,500,000 and reducing the verdict of $5,000,000 for past pain and suffering of Mr. Earl Clarke to $1,500,000, and otherwise denied those motions. Thereafter, the plaintiffs consented to the entry of judgments, as reduced by the trial court, in the

total sums of $4,275,213.13, including interest, costs and disbursements, for Mr. James Clarke, and of $1,584,776.42, including interest, costs and disbursements for the estate of Mr. Earl Clarke.

While the case was pending on the appeal, Mr. James Clarke died, and therefore, the caption in this matter has been amended to read: "ROSE CLARKE, as Administratrix of the Goods, Chattels and Credits that were of James Clarke, deceased."

Mr. Arthur W. Clemens was called as a witness for the defendant. He testified, in substance, that, on the day of the accident, as a New York City Fire Marshal, he was ordered to the scene to investigate the cause of the accident. Thereafter, he went to the emergency room of the Burn Center, where he was only able to interview Mr. Earl Clarke. Further, he stated that, as soon as he returned to his office later that day, he prepared, in the regular course of his duties, a typed report of the interview for the office files (report).

When the defendant attempted to offer the said report, containing certain admissions of Mr. Earl Clarke as to how the accident occurred, into evidence, plaintiffs objected, and the trial court sustained that objection, upon the basis that "Fire Marshal Clemens is here to testify".

Our examination of the report indicates that when, less than an hour after the accident occurred, Fire Marshal Clemens questioned Mr. Earl Clarke, he received the following response:

*"Earl Clarke,* M/B, D.O.B. 8-12-48 resides at 362 Sutter Avenue. Bklyn, N.Y. apt. 7G, states that he and his brother James Clarke were at the end of the station (100 feet from station-track area). They were drinking and they usually hangout in this area. As he was getting up he slipped and fell to the third tail *[sic],* then his brother grabbed him and they both got burned. He does not remember anything after that. He also states that they were the only ones in that area.

*"Investigators Notes:* Unable to interview James Clarke, because of his condition" (emphasis in text).

CPLR 4518, entitled "Business records", is an exception to the hearsay rule, and in subdivision (a), it states, in pertinent part, that a Judge may admit into evidence any writing or record, which he or she finds "was made in the regular course of any business and that it was the regular course of such business to make it, at the time of the act, transaction,

occurrence or event, or within a reasonable time thereafter" *(see, People v Kennedy,* 68 NY2d 569, 578-580 [1986]; *Williams v Alexander,* 309 NY 283, 286-287 [1955]; *Ward v Thistleton,* 32 AD2d 846, 847 [1969]).

In *Williams v Alexander (supra,* at 286-287), the Court of Appeals summed up the purpose of the business record exemption to the hearsay rule, as follows: "The statute * * * is designed to harmonize the rules of evidence with modern business practice and give 'evidential credit' to the memoranda or other writings upon which reliance is placed in the systematic conduct of business undertakings * * * It rests upon the probability of trustworthiness which inheres in such records, by virtue of the fact, first, that they are the 'routine reflections of the day to day operations of a business' *(Palmer* v. *Hoffman,* 318 U. S. 109, 114) and, second, that it is the entrant's own obligation, and to his interest, to have them truthful and accurate, made and kept as they are with the knowledge, indeed, for the purpose, that they will be relied upon in the conduct of the enterprise * * * It is this element of trustworthiness, serving in place of the safeguards ordinarily afforded by confrontation and cross-examination, which justifies admission of the writing or record without the necessity of calling all the persons who may have had a hand in preparing it".

It is well-established law that a business record is admissible, although the person, such as Fire Marshal Clemens, who prepared the record, is available to testify *(Meiselman v Crown Hgts. Hosp.,* 285 NY 389, 397 [1941]; *Napolitano v Branks,* 141 AD2d 705, 706 [1988]).

■ After reviewing the transcript, we conclude that, rather than offering the report to prove the contents of another original written document, the principal purpose that the defendant offered the Fire Marshal's report was to prove the fact that, less than an hour after the accident, plaintiff, Mr. Earl Clarke, significantly admitted that it was the plaintiffs' own actions, while they were drinking in the track area, which resulted in their injuries, and not the defendant's negligence. Repeatedly, it has been held that "[t]he 'best evidence' objection [is] inapplicable [when the document is] not introduced to prove the contents of another original written document (see Richardson, Evidence [Prince, 10th ed], § 568, p 578)" *(Flynn v Manhattan & Bronx Surface Tr. Operating Auth.,* 61 NY2d 769, 771 [1984]; *Dependable Lists v Malek,* 98 AD2d 679, 680 [1st Dept 1983], *appeal dismissed* 62 NY2d 645

[1984]; *Anzalone v State Farm Mut. Ins. Co.,* 92 AD2d 238, 240 [1983]).

After applying the legal authority analyzed *supra,* to the facts before us, indicating that Fire Marshal Clemens prepared the report in the regular course of his duties, promptly after he interviewed Mr. Earl Clarke, we find that the trial court committed reversible error, when it excluded the report from evidence, and did not admit same as a business record exception to the hearsay rule (CPLR 4518 [a]), since that action by the trial court prevented defendant from presenting substantial evidence to the jury indicating that the defendant was not guilty of any negligent conduct.

Defendant contends further that the trial court committed error, when it charged the jury, over defendant's objection, that the estate of Mr. Earl Clarke had a lesser burden of proof. Specifically, the trial court instructed in pertinent part, that: "Now, let me just say that with respect to Earl Clarke's claim, Earl Clarke as we know is dead and in that case and in this situation where Earl Clarke is dead, the Administratrix of Earl Clarke's estate is not held to as high a degree of proof as is required of an injured plaintiff such as James who is alive and who can himself describe what happened and he did, he testified".

More than 40 years ago, the Court of Appeals, in *Noseworthy v City of New York* (298 NY 76, 80 [1948]), stated that *in a wrongful death action* the plaintiff is held to a lesser standard of proof, "since the decedent is unavailable to recount his [or her] version of the events" *(Costalas v City of New York,* 143 AD2d 573, 575 [1st Dept 1988]).

Although the complaint did not contain a cause of action for the wrongful death of Mr. Earl Clarke, following the submission of a physician's affidavit during trial, indicating he died as a result of his injuries, the trial court permitted testimony by the plaintiffs' expert on that issue, and granted plaintiffs' motion to conform the pleadings to the proof, so as to assert a claim for the wrongful death of Mr. Earl Clarke. Thereafter, shortly before summations, plaintiffs' counsel withdrew, with prejudice, the cause of action for wrongful death on behalf of the beneficiaries of the estate of Mr. Earl Clarke, when the trial court ruled that evidence of Mr. Earl Clarke's record of criminal convictions and incarceration would be admissible on the wrongful death cause of action, to indicate his character, social habits and tendency and ability to support his family.

■ Since the wrongful death claim has been withdrawn, this is no longer a wrongful death action case. We find that, upon the facts herein, indicating that Mr. Earl Clarke survived the accident and did not die until almost a year later of unrelated causes, that the trial court was in error, and prejudiced the defendant, by charging, as in a wrongful death case, that the estate of Mr. Earl Clarke had a lesser burden of proof.

In addition, defendant contends that the trial court committed reversible error by admitting into evidence, without limiting instructions, the internal rules of the defendant, since those rules imposed a standard of care upon defendant, which exceeded that required by law.

Our examination of the documents admitted into evidence indicates that they include the complete 1972 and 1979 Rules and Regulations Governing Employees Engaged in the Operation of the New York City Transit System. Each booklet contains more than 150 rules, many with multiple subdivisions, and substantial excerpts from the defendant's Police Manual (3d ed, June 1987). Further, we find many pages of the transcript filled with plaintiffs' trial counsel reading to the jury, word by word, from the said documents, concerning numerous of the defendant's internal rules, relating to, *inter alia,* the duties of station superintendents, platform conductors, railroad clerks, and porters, the inspection of subway toilets, the prohibition of sleeping in the subways, and the manner in which persons, who enter the system, carrying large bundles, should be handled.

■ While the Court of Appeals has held that internal rules are admissible and may be considered by the jury as evidence of the standard of reasonable care *(Kush v City of Buffalo,* 59 NY2d 26, 31-32 [1983]), same are not admissible, when they impose a standard higher than that otherwise set by law *(Rivera v New York City Tr. Auth.,* 77 NY2d 322, 329 [1991]; *Crosland v New York City Tr. Auth.,* 68 NY2d 165, 168-169 [1986]). In *Lesser v Manhattan & Bronx Surface Tr. Operating Auth.* (157 AD2d 352, 356 [1st Dept 1990]), we stated "[w]hile internal operating rules may provide some evidence of whether reasonable care has been taken and thus some evidence of the defendant's negligence or absence thereof, such rules must be excluded, as a matter of law, if they require a standard of care which transcends the area of reasonable care".

Significantly, we do not find anywhere in the record any

evidence indicating that, prior to the incident, the plaintiffs were aware of defendant's internal rules, and relied upon them to their detriment. The Appellate Division, Second Judicial Department, has observed that "there is no basis for the proposition that a party may be held liable for failing to follow a policy which it has adopted voluntarily, and without legal obligation, especially where there is no showing of detrimental reliance by the plaintiffs on the defendants following that policy *(cf.,* Prosser and Keeton, Torts § 56, at 380-381)" *(Newsome v Cservak,* 130 AD2d 637, 638 [1987]).

Although defendant's counsel did not specifically object to the admission into evidence of the sets of internal rules, based upon the record herein, indicating that defendant's counsel made a number of objections to the questions of plaintiffs' counsel, which dealt with particular rules, we find those objections were sufficiently precise to serve to alert the trial court to the problem *(see, Kulak v Nationwide Mut. Ins. Co.,* 40 NY2d 140, 145-146 [1976]), and accordingly, we further find that this issue has been preserved for our review (CPLR 5501 [a] [3]).

Applying our analysis of the legal authority, *supra,* to the facts before us, we find that the trial court committed prejudicial error by admitting the internal rules, without limiting instructions, since "[t]he jury should have been instructed that a violation of [the] rule would represent some evidence of negligence only if it first determined that the rule imposed a standard of care no greater than that which reasonable prudence required *(cf., Danbois v New York Cent. R. R. Co.,* 12 NY2d 234, 237)" *(Cincotta v Johnson,* 130 AD2d 539, 541 [1987]).

In addition, defendant contends that the misconduct of the plaintiffs' trial counsel deprived it of a fair trial.

Our examination of the record indicates that, during the summation, plaintiffs' trial counsel committed a number of improper acts, including acting as an unsworn witness, vouching for the credibility of his own witnesses, accusing defense witnesses of lying, and accusing a defense medical expert of lying for pay.

It is well-settled law that a trial counsel improperly acts as an unsworn witness, when he interjects "unsworn statements of personal knowledge of the facts of the case (see Code of Professional Responsibility, DR 7-106 [C] [3])" *(Weinberger v City of New York,* 97 AD2d 819, 820 [1983]; *Senn v Scudieri,*

165 AD2d 346, 355-356 [1st Dept 1991]; *Caraballo v City of New York,* 86 AD2d 580 [1st Dept 1982]; *Kohlmann v City of New York,* 8 AD2d 598 [1st Dept 1959]).

During the trial, a defense witness, New York City Transit Authority Police Sergeant Donald R. Tisdall (Sergeant Tisdall) testified that, in the area of the tracks where the plaintiffs were discovered, "I found the evidence of a narcotics use * * * some candles, a cooker, a hypodermic needle and syringe". In order to attack the credibility of Sergeant Tisdall, we find that the plaintiffs' trial counsel improperly acted as an unsworn witness during his summation *(Siefring v Marion,* 22 AD2d 765, 766 [1st Dept 1964]) by, without support in the record, arguing:

"You had this Sergeant Tisdall come into this court at the end of this trial. The man testified with regard to finding a hypodermic needle and hypodermic syringe and a cooker right there next to the Clarke brothers who were on the third rail * * *

"Now, what is the real fact? The real fact is that he never saw any such thing, that that is false, absolutely false and misleading and notwithstanding what he claims to be an honest face, Sergeant Tisdall, you remember, he was the man with the honest face when we needed honest answers".

Further, it is error for trial counsel to bolster his case on summation by repeated accusations that the witnesses for the other side are liars *(Vassura v Taylor,* 117 AD2d 798, 799-800 [1986]; *Taormina v Goodman,* 63 AD2d 1018 [1978]). For example, plaintiffs' trial counsel unfairly argued Sergeant Tisdall "lied in his teeth with regard to the cooker, to the paraphernalia", and "Members of the jury, a lot is at stake for the Transit Authority of the City of New York. Money is at stake and let me tell you the fact that it happens to be the Transit Authority of the City of New York doesn't change the picture relative to truthfulness. The big guy the great Transit Authority, they operate through people. They operate through representatives. They operate through their witness. They operate through people who are associated with the City of New York, fire marshalls *[sic],* associated, Transit Authority of the City of New York".

In view of the fact that we have consistently held that it is error for trial counsel to accuse medical experts, without supporting evidence, of being willing to testify falsely for a fee *(Senn v Scudieri, supra,* at 357; *Berkowitz v Marriott Corp.,*

163 AD2d 52, 53-54 [1st Dept 1990]), we find that plaintiffs' trial counsel erred, when he stated that Dr. Alden, a medical expert, who testified on behalf of the defendant, "is nothing but a paid expert who will say anything whatsoever without regard to what is right, without regard to what is truthful."

Based upon our analysis of the conduct of plaintiffs' trial counsel on summation, we find that such conduct did not consist of "an isolated remark during questioning or summation, but a seemingly continual and deliberate effort to divert the jurors' and the court's attention from the issues to be determined" *(Mercurio v Dunlop, Ltd.,* 77 AD2d 647 [1980]). Further, we find that this conduct of plaintiffs' trial counsel was more than mere trial tactics and was conduct "calculated to influence the jury by considerations which were not legitimately before them, and cannot be dismissed as inadvertent, thoughtless or harmless" *(Kohlmann v City of New York,* 8 AD2d 598 [1st Dept 1959]).

Since the numerous errors that we found *supra,* concerning the trial court's evidentiary rulings, that court's charge, and the prejudicial summation by plaintiffs' trial counsel, require that this matter be remanded for a new trial, we need not reach the defendant's remaining contentions.

Accordingly, judgment, Supreme Court, New York County (Leonard N. Cohen, J., with a jury), entered July 5, 1990, which, *inter alia,* awarded plaintiff, Mr. James Clarke, the total sum of $4,275,213.13, including interest, costs and disbursements, and plaintiff, the estate of Mr. Earl Clarke, the total sum of $1,584,776.42, including interest, costs and disbursements, is unanimously reversed, on the law and on the facts, the judgment is vacated, the jury verdict set aside, and the matter remanded for a new trial, with costs to abide the event.

MILONAS, J. P., ROSENBERGER, KUPFERMAN and ASCH, JJ., concur.

Judgment, Supreme Court, New York County, entered July 5, 1990, unanimously reversed, on the law and on the facts, the judgment is vacated, the jury verdict set aside, and the matter remanded for a new trial, with costs to abide the event.