[15 NYS3d 21]

James Gregware et al., Respondents, v City of New York, Appellant, Burtis Construction Co. Inc., Appellant-Respondent, and Abelardo Da-Silva, Respondent.

First Department, August 4, 2015

**APPEARANCES OF COUNSEL**

*Simpson Thacher & Bartlett LLP*, New York City (*George S. Wang, Shannon K. McGovern* and *Jamie H. Somoza* of counsel), *Corporation Counsel*, New York City (*Zachary W. Carter* of counsel), for appellant.

*Mauro Lilling Naparty LLP*, Woodbury (*Deidre E. Tracey* and *Matthew W. Naparty* of counsel), for appellant-respondent.

*Gair, Gair, Conason, Steigman, MacKauf, Bloom & Rubinowitz*, New York City (*Ben Rubinowitz* and *Richard M. Steigman* of counsel), for Gregware respondents.

*Thomas M. Bona, P.C.*, White Plains (*James C. Miller* and *Thomas M. Bona* of counsel), for Abelardo Da-Silva, respondent.

### OPINION OF THE COURT

MANZANET-DANIELS, J.

This appeal arises from a judgment entered in favor of plaintiffs following a multivehicle collision on the West Side Highway. The jury determined that the City of New York and Burtis Construction Co. were negligent and had acted with reckless disregard for the safety of others in setting up an unsafe lane closure on the West Side Highway for a short-term construction project, and that their negligence or recklessness was a substantial factor in causing plaintiff James Gregware's significant and debilitating injuries.

On this appeal, we consider, among other issues, whether plaintiffs' counsel's remarks during summation tainted the proceedings to such an extent that the City was deprived of a fair trial.* We also address whether the apportionment of damages as between the City and Burtis was supported by the evidence. While the tenor of counsel's remarks was regrettable, we do not believe that the cumulative effect of the remarks deprived defendant of a fair trial. Nonetheless, because we find that the 65%-35% apportionment of liability as between the City and Burtis is against the weight of the evidence, we remand for a new trial solely as to the apportionment of damages between the City and Burtis.

### The Accident

The City, which owns the West Side Highway, has a nondelegable duty to ensure that it is maintained in a safe condition. The City hired Burtis to repair a seam in the roadway in the northbound lanes of travel. The contract between the City and Burtis contained a plan for the maintenance and protection of traffic (MPT). The MPT governed the manner in which the work was to be performed and the safety measures to be undertaken for closing lanes of traffic. The MPT stated that "[a]ll maintenance and protection of traffic work shall conform to the New York State Manual of Uniform Traffic Control Devices except as modified by the plans and/or the proposal."

At the time of the accident, the left and center lanes of the northbound side of the West Side Highway were closed, leaving

---

* Defendant Burtis does not raise this issue on appeal.

only the right lane available for passing traffic. Plaintiffs' expert testified that the manner in which the lanes had been closed was "totally inadequate," and a "severe deviation from the standards." Using a diagram from the MPT, he described the minimum standards for a two-lane closure on a three-lane highway: multiple and specific signs of the impending lane closures prior to the first barrel, including "roadwork one mile," "left two lanes closed one half mile," "left two lanes closed 1500 feet," and an arrow board directing drivers to merge; additional signs as the tapered and staggered lane closure proceeds; and lighted barrels marking the lane closures, with the first barrel appearing 3,630 feet before the expansion joint under repair. Plaintiffs' expert further testified that because defendants failed to comply with these standards, drivers were forced to suddenly, and without warning, merge to the right lane.

On May 20, 2006, at approximately 1:00 a.m., a two-car accident occurred approximately 200 feet south of the taper. No changes to the lane closure setup were made following the accident, and work resumed on the roadway.

At approximately 3:00 a.m., while the left two lanes of traffic were still closed, a five-car pileup occurred in the area of the earlier accident. A taxi operated by Mohammad Kamrul Hassan that was merging from the left to center lane was rear-ended by a vehicle in the left lane driven by Omar Albahri. The Hassan vehicle in turn struck the car in front of it in the center lane, driven by Romulo Romero-Valazero. Following the collisions, the motorists exited their respective vehicles and were standing in the roadway. Plaintiff Gregware, coming over a blind hill in the road, tried to stop but rear-ended the Albahri vehicle. Plaintiff exited his vehicle to exchange insurance information, and was struck and knocked to the ground when the vehicle driven by defendant Abelardo Da-Silva rear-ended his vehicle.

Plaintiff's Injuries

Plaintiff James Gregware suffered severe and debilitating injuries to his legs, knees, pelvis, shoulder, and ribs, including fractures of the tibia, fibula, and pelvis, and numerous tears of the ligaments supporting both knees, requiring that he spend three weeks in the trauma unit at St. Vincent's Hospital. Plaintiff underwent the first of five surgeries to stabilize his knees on May 30, 2006. On June 5, 2006, he was transferred to Warburg Nursing Home for rehabilitation. Following removal of the casts, his legs were swollen and severely atrophied.

Plaintiff was fitted with braces and had to relearn how to walk. Two physical therapists worked on his knees on a daily basis to break up scar tissue formation. After discharge from the nursing home, on August 12, 2006, plaintiff commenced outpatient physical therapy for three-hour sessions three times per week.

Plaintiff underwent further surgery on his left knee on January 22, 2007, and on his right knee on February 5, 2009. On May 23, 2011, he underwent a further surgery on the left knee. Following each surgery, he was required to resume use of braces and to restart physical therapy.

Plaintiff, who remains in considerable pain, requires anti-inflammatories and, at times, narcotic medication. His knees remain unstable and he will eventually develop osteoarthritis. Over the course of his life, he will require four total knee replacement surgeries, two on each leg. Plaintiff, 41 years of age at the time of the accident, will suffer pain in his knees for the rest of his life due to the extent of the injuries.

The City's Witnesses

Officer Joseph Pagano and Dr. Ali Sadegh testified on behalf of the City. At Pagano's EBTs, four and five years post-accident, he professed to having no independent memory whatsoever of the accident or the surrounding circumstances. Pagano could not recall, inter alia, whether he had interviewed any of the drivers or passengers of the vehicles, whether he had spoken to or canvassed the area for any other witnesses, whether there was ongoing construction in the vicinity of the accident, whether any roadway lanes were closed at the time, whether there were any cones or video messaging boards, whether any photographs or measurements had been taken, or whether any of the injured parties had been outside of their vehicles at the time they were hit. When presented with his own memo book and asked if it refreshed his recollection of the accident or his investigation, he stated "no."

Nonetheless, at trial, two years following his last EBT and seven years after the accident, Pagano was able to remember details concerning the accident. Not only did he purport to remember the accident itself, he remembered where he had parked his patrol car, and the distance from his vehicle to the accident scene. He testified as to the configuration of the vehicles after the accident and to having seen a construction sign near the accident.

He admitted that his memory at the time of his EBTs "was not as good," explaining that review of documents and discuss-

ing the case "helped [him] recall information." On cross, Pagano testified that he had a "clearer recollection" at trial than he had at the time of the EBT. He testified that he had met with counsel for the City approximately five times before trial and had visited the accident scene with counsel on two occasions. Defense counsel had shown him photos of the accident scene and "pointed things out."

The only other live witness presented by the City was Dr. Ali Sadegh, a professor of mechanical engineering and an expert in accident reconstruction. Although Dr. Sadegh claimed to have sufficient knowledge in the field of medicine to provide the jury with certain medical opinions, including conclusions gleaned from reading X rays and CT scans, he conceded that he had only audited one medical school course at Columbia University. He also professed to having learned how to read X rays and CT scans from two courses he had taken with the Society of Automotive Engineers.

Plaintiffs' Counsel's Summation

In the course of his 125-page summation, plaintiffs' counsel argued, inter alia, that the City and Burtis took "shortcuts" in setting up the construction project on the West Side Highway, resulting in several accidents including the one that had caused serious and debilitating injuries to plaintiff James Gregware. Counsel further argued that the City and Burtis had sought to avoid liability for their own negligence by blaming one another, as well as the other motorists involved in the accident.

Counsel noted that Officer Pagano professed to have no memory of the accident at his EBTs, yet claimed to remember the accident in detail during trial. He argued that it was implausible that Officer Pagano's memory had suddenly improved after the passage of seven years. He pointed out that Officer Pagano had met with the City's attorneys on five occasions, and stated, "It is infuriating to me that they would go this far to try to change the testimony of an officer who stated under oath hundreds of times that he didn't remember, that he didn't know," and accused Pagano of being "fed information by his attorneys," who "are telling him what happened." Continuing in this vein, counsel stated, "I'm trying to tell you because it is so wrong for an officer to swear to tell the truth and tell less than the truth under oath, it's wrong." He also characterized Officer Pagano as "one of New York City's wors[t]."

While pointing out inconsistencies in the testimony of the city inspectors, counsel stated "So when we focus on what [the

City's counsel] Mr. Wang was saying, credibility? Credibility, Mr. Wang? Really? Your own witness lied." He also, in the course of disparaging the qualifications of the City's expert, Dr. Sadegh, referred to him as a "phoney baloney."

While questioning the credibility of the defense's witness, plaintiffs' counsel remarked, "[W]hen you evaluate the believability and credibility, that is all that we have as lawyers. When we come into a courtroom such as this, before her Honor and we present proof to you, all we can do is do it honestly, do it fairly and do the right thing."

In response to Burtis's counsel's statement that one of the motorists testified to having seen five signs warning of the merge on the highway, plaintiffs' counsel pointed out that the motorist had actually testified to seeing one sign, whereupon he stated, "Now a lawyer stood before you and said, he said five signs. He said five signs. That's what I have a problem with. When we stand up here, it's our credibility . . . credibility of the witnesses is important. But the credibility of the lawyer is equally important."

In addition, during his summation, plaintiffs' counsel referred to counsel for the City as "Wang and his gang."

Midway through plaintiffs' counsel's summation, the City made a motion for a mistrial based on what it characterized as "personal attacks on counsel," comments with "racial overtones," and plaintiffs' counsel's vouching for his own credibility. After reviewing the transcript, the court denied the motion.

Deliberations and Verdict

Following a six-week trial and five days of deliberations, the jury returned a verdict in favor of plaintiffs and against the City and Burtis, finding the City to be 65% responsible and Burtis to be 35% responsible for plaintiff's injuries. The jury also found that the City and Burtis had acted with reckless disregard for the safety of others. The jury awarded plaintiff $2.2 million for past pain and suffering, and $3.8 million for future pain and suffering. Plaintiff wife was awarded $700,000 for past loss of services and $425,000 for future loss of services and consortium.

The trial court denied defendants' posttrial motions to set aside the jury's verdict on liability and damages, finding ample evidence to support the liability finding and the damages verdict. The court entered judgment in plaintiffs' favor on October 15, 2014.

Discussion

■ The verdict was based on legally sufficient evidence and was not against the weight of the evidence. There was ample evidence, including witness and expert testimony, that the narrowing of the highway due to lane closures, without adequate warning, was a proximate cause of plaintiff James Gregware's injuries.

Both the City and Burtis owed plaintiff a duty of care. The City has a nondelegable duty to maintain its roadways in a reasonably safe condition (*see Thompson v City of New York*, 78 NY2d 682, 684 [1991]), and Burtis, which was performing work on the highway pursuant to a contract with the City, was responsible for providing, installing and maintaining traffic safety devices. There was sufficient evidence that Burtis's narrowing of the roadway, without adequate warning to drivers, created or exacerbated a dangerous condition (*see Belmer v HHM Assoc., Inc.*, 101 AD3d 526, 529 [1st Dept 2012]).

There was sufficient evidence that neither plaintiff nor Da-Silva was negligent. Defendant Da-Silva offered a nonnegligent explanation for rear-ending plaintiff's car—namely, the lack of any warning of lane closures or the need to slow down (*cf. Collins v City of New York*, 105 AD3d 631, 632-633 [1st Dept 2013] [operation of Department of Education (DOE) van, and not tapers, was a proximate cause of the plaintiff's injuries, where there was no evidence that the DOE van was unable to safely merge], *lv denied* 22 NY3d 854 [2013]). Nor was there conclusive evidence that Da-Silva was speeding. Similarly, there was no evidence that plaintiff was speeding, nor was there any evidence that his vehicle's collision with a stopped car was a proximate cause of his injuries.

On a prior appeal in this action, we merely held that the drivers of the cars involved in the initial accident did not cause Da-Silva's vehicle to hit plaintiff's vehicle (*see* 94 AD3d 470 [1st Dept 2012]).

■ However, the jury's apportionment of 65% liability to the City was against the weight of the evidence, in light of the evidence that Burtis was responsible for setting up and maintaining the traffic pattern alleged to have caused plaintiff Gregware's accident (*see Lizden Indus., Inc. v Franco Belli Plumbing & Heating & Sons, Inc.*, 95 AD3d 738, 738-739 [1st Dept 2012] [apportionment of 75% fault to the defendant was contrary to the weight of the evidence where a codefendant "performed the work" at issue]; *Wellington v New York City Tr. Auth.*, 79 AD3d

547, 547-548 [1st Dept 2010] [jury's apportionment of 70% of liability against Transit Authority was against the weight of the evidence where the evidence showed that a codefendant was more at fault]).

At trial, it was established that a team of Burtis workers, overseen by foreman Mario D'Abruzzo, transported, installed, maintained, and removed all of the construction equipment and traffic control devices near the accident site. D'Abruzzo's team set up the traffic pattern, including the taper and the layout of cones and barrels. Ruben Davydov, the only representative of the City on site, observed the traffic pattern and looked for an "obvious problem." He disavowed any responsibility for setting up lane closures or ensuring compliance with the contract provisions regarding placement of traffic control devices. The verdict apportioning 65% of liability to the City is against the weight of the evidence where, at most, the City "fail[ed] to find and correct a dangerous condition created by others" (*Gannon Personnel Agency v City of New York*, 57 AD2d 538, 540 [1st Dept 1977] [apportionment of 65% liability to the City was contrary to the weight of the evidence where faulty plumbing by a contractor caused a gas explosion and record supported the inference that the City had actual knowledge of potential danger created by the improper gas piping and failed to take proper protective action through its onsite inspector, who permitted the gas to be turned back on]).

The Court Properly Charged the Jury

■ Contrary to defendants' argument, there was sufficient evidence to support the court's "reckless disregard" charge as to the City and Burtis, including evidence of a prior accident at the same location shortly before plaintiff's accident. Following the earlier accident, neither the City nor Burtis took any action to correct the dangerous condition created by the improper lane closures. The jury was free to determine that this conscious decision constituted an act of unreasonable character in disregard of a known or obvious risk, namely, that another accident would occur (*see Detrinca v De Fillippo*, 165 AD2d 505 [1st Dept 1991] [plaintiff sufficiently alleged reckless disregard on the part of defendant garage where the record showed that there was inadequate lighting in the garage, insufficient signage, and previously reported vehicle accidents in the garage]). There was evidence that the City, which was contractually required to provide an engineer in charge and project manager to inspect the project, took "short cuts" in its oversight

of the roadway. Further, the evidence showed a disregard for the many safety requirements set forth in the contract and the MPT.

The court did not err in declining to charge that Da-Silva was speeding, given the inconclusive evidence on the issue. Nor was it error for the court to decline to charge that plaintiff was presumptively at fault in rear-ending a vehicle, given the lack of evidence that this collision was a proximate cause of plaintiff's injuries.

Plaintiffs' Counsel's Summation

We next turn to the issue of whether a new trial is warranted in light of plaintiffs' counsel's inflammatory remarks during summation.

It is well settled that trial counsel is afforded wide latitude in presenting arguments to a jury in summation (*see Califano v City of New York*, 212 AD2d 146, 154 [1st Dept 1995]). During summation, an attorney "remains 'within the broad bounds of rhetorical comment in pointing out the insufficiency and contradictory nature of a plaintiff's proof' without depriving the plaintiff of a fair trial" (*Selzer v New York City Tr. Auth.*, 100 AD3d 157, 163 [1st Dept 2012] [emphasis and citation omitted]). However, an attorney may not "bolster his case . . . by repeated accusations that the witnesses for the other side are liars" (*Clarke v New York City Tr. Auth.*, 174 AD2d 268, 277 [1st Dept 1992]; *see e.g. Berkowitz v Marriott Corp.*, 163 AD2d 52, 53-54 [1st Dept 1990] [counsel's conduct, including "engag-(ing) in an unfair and highly prejudicial attack upon the credibility and competence of defendants' expert witnesses and attorneys," referring to the experts repeatedly as "hired guns" brought in to "fluff up the case," warranted a new trial]).

■ Although the City failed to object to the bulk of the challenged comments during summation, the City moved for an immediate mistrial based on comments impugning defense counsel, the reference to "Wang and his gang," and plaintiffs' counsel's allegedly vouching for his own credibility. We find that although some of the comments were highly inflammatory, they did not " 'create a climate of hostility that so obscured the issues as to have made the trial unfair' " (*Wilson v City of New York*, 65 AD3d 906, 908 [1st Dept 2009] [citation omitted]). The jury had ample reason to question the testimony of Officer Pagano, lessening the danger that they were improperly influenced by plaintiffs' counsel's remarks.

Plaintiffs' counsel was certainly entitled to express skepticism regarding Officer Pagano's ability to recall details about

the accident scene. It strains credulity that the officer would suddenly recollect details concerning the accident when he had been unable, during the course of two prior EBTs, to recall anything regarding the accident, even after counsel attempted to refresh his recollection using his own memo book. A witness's recollection does not generally improve with age, but becomes less vivid; counsel was entitled to suggest that the officer's sudden "recollection" was instead attributable to numerous trial prep sessions. In light of Pagano's admission that his own memo book was not useful in refreshing his recollection, and his complete inability to offer any other reasonable explanation for his radically improved memory, plaintiffs' counsel properly asked the jury during summation to question the officer's credibility and the source of his knowledge about the accident (see Selzer, 100 AD3d at 163 [counsel entitled to argue that the opposing party's "account of the accident did not make sense, pointing out the insufficient and contradictory nature of his testimony"]).

We do not perceive comments referring to the City's counsel as "Wang and his gang" as having improper racial overtones. Rather, the remark appeared to be a reference to the many lawyers from Mr. Wang's firm who participated in the trial. The comment was made in the context of explaining to the jury that at his EBT Pagano had been represented by other attorneys, "not Wang and his gang."

The City's assertion that plaintiffs' counsel vouched for his own credibility is a distortion of the record. To the extent that plaintiffs' counsel employed the word "credibility" in commenting on the defense's characterization of evidence, such comments were responsive to the defense's argument concerning one of the witness's specific recollections.

Questioning the credibility of the City's witnesses and referring to them as "liars" were highly improper. The remarks were, however, isolated and constituted fair comment on the evidence (see Nieves v Riverbay Corp., 95 AD3d 458, 459 [1st Dept 2012]). While the tenor of counsel's remarks was, at times, regrettable, we do not believe that the cumulative effect of the remarks deprived defendant of a fair trial.

Damages for Past and Future Pain and Suffering

The awards of $2.2 and $3.8 million for past and future pain and suffering, respectively, do not deviate from what is considered reasonable compensation (see Hernandez v New York City Tr. Auth., 52 AD3d 367 [1st Dept 2008] [award of

$2.5 million for past pain and suffering and $3 million over 24 years for future pain and suffering appropriate where the plaintiff suffered severe injuries to her legs, along with less severe injuries to her arm, shoulder and ankle, was in the hospital for three months, underwent five operations and will require at least one other in the future, and remained in pain]; *Carl v Daniels*, 268 AD2d 395 [1st Dept 2000] [$2.3 million for past and $2.5 million for future pain and suffering appropriate for a plaintiff who sustained a severe comminuted fracture of the left femur requiring two surgical procedures post accident and a third surgery a year and a half later to remove a rod from the leg], *lv denied* 96 NY2d 704 [2001]). It should be noted that neither the City nor Burtis provided any expert testimony to contradict or challenge Dr. Hershman's opinion regarding the extent of plaintiff's injuries, despite having conducted five separate independent medical examinations.

Loss of Services and Society

The award of $700,000 for past loss of services and society, and $425,000 for future loss of services and society, did not deviate materially from what is considered reasonable compensation. Plaintiff wife "has effectively been thrust into the role as the sole parent for the parties' [three] young children and bears total responsibility for preparing them for their daily activities" (*Doviak v Lowe's Home Ctrs., Inc.*, 63 AD3d 1348, 1353 [3d Dept 2009]). She assumed the responsibility for managing the household, caring for three children, and tending to her husband's most basic needs while her husband underwent multiple surgeries (*see Aguilar v New York City Tr. Auth.*, 81 AD3d 509 [1st Dept 2011] [award to husband of $500,000 over 3.7 years for past loss of services reasonable where the wife, a 45-year-old mother of three, suffered amputation of her left leg and was dependent on others for the most basic care]). The award of $425,000 for future loss of services and society is reasonable in light of evidence that plaintiff and his wife are still unable to have sexual relations, are no longer socially active, and that plaintiff will require four total knee replacements in the future (*see Aguilar*, 81 AD3d at 509 [affirming $1 million award for future loss of services]; *Villaseca v City of New York*, 48 AD3d 218, 219 [1st Dept 2008] [award of $500,000 for future loss of services appropriate where the wife "assumed full responsibility for household chores, cooking, transportation for their young son, and helping her husband move about"]).

## Cross Claim for Indemnification

The City established its entitlement to summary judgment on its cross claim for contractual indemnification. The indemnification provision, which provides that Burtis shall indemnify the City for "any and all claims . . . and from costs and expenses to which the City may be subjected . . . arising out of or in connection with any operations of [Burtis]," expressed an unmistakable intent that Burtis indemnify the City, regardless of whether either party is at fault or is found liable (*see Bradley v Earl B. Feiden, Inc.*, 8 NY3d 265, 275 [2007]; *see also New York Tel. Co. v Gulf Oil Corp.*, 203 AD2d 26, 27-28 [1st Dept 1994]).

We have considered and rejected defendants' additional arguments.

Accordingly, the judgment of the Supreme Court, New York County (Eileen A. Rakower, J.), entered October 15, 2013, after a jury trial, apportioning liability 65% against defendant City of New York and 35% against defendant Burtis Construction Co. Inc., awarding plaintiffs damages in the principal amounts of $2.2 million for past pain and suffering, $3.8 million for future pain and suffering, $700,000 for past loss of services and consortium and $425,000 for future loss of services and consortium, and bringing up for review the orders, same court and Justice, entered on July 12, 2013 and July 15, 2013, which, among other things, denied defendants' posttrial motions to set aside the verdict and defendant City's posttrial motion for summary judgment on its cross claim for contractual indemnification against Burtis, should be modified, on the law and the facts, to grant the City's motion for summary judgment on its cross claim, and to remand the matter for a new trial on the issue of the apportionment of liability as between the City and Burtis, and otherwise affirmed, without costs.

SWEENY, J. (dissenting). I dissent. The record clearly reflects a pattern of highly inflammatory, prejudicial and improper comments made by plaintiffs' counsel during his summation. Taken as a whole, those comments deprived defendants, particularly the City of New York, of a fair trial. I would therefore remand this case for a new trial on all issues.

There are certain well-settled principles established that apply to all trials. Basic to our adversarial system of justice is the principle that "all litigants, regardless of the merits of their

case, are entitled to a fair trial" (*Habenicht v R. K. O. Theatres*, 23 AD2d 378, 379 [1st Dept 1965]). A trial court has "broad authority to control the courtroom, rule on the admission of evidence, elicit and clarify testimony, expedite the proceedings and to admonish counsel and witnesses when necessary" (*Campbell v Rogers & Wells*, 218 AD2d 576, 579 [1st Dept 1995], citing *Matter of Brostoff v Berkman*, 170 AD2d 364, 365 [1st Dept 1991], *affd* 79 NY2d 938 [1992]). Trial counsel is "afforded wide latitude in presenting arguments to a jury in summation" and where the attorney "remains within the broad bounds of rhetorical comment in pointing out the insufficiency and contradictory nature of [a party's evidence], such remarks do not deprive the [opposing party] of a fair trial" (*Chappotin v City of New York*, 90 AD3d 425, 426 [1st Dept 2011], *lv denied* 19 NY3d 808 [2012]). At the end of a lengthy trial, it may be inevitable that some improper remarks will be made during closing arguments. Not all such remarks will require a new trial, so long as they are limited in nature, are deemed harmless in view of the totality of the evidence, and do not contaminate the proceedings to the extent of depriving a party of a fair trial. In addition, counsel must be quickly admonished and the jury must be given immediate curative instructions (*see e.g. Genza v Richardson*, 95 AD3d 704, 705 [1st Dept 2012]; *Chappotin*, 90 AD3d at 426; *Pareja v City of New York*, 49 AD3d 470 [1st Dept 2008]). Thus, the "wide latitude" given to counsel in summation is not without its limitations.

"The underlying principle is that litigants are entitled, as a matter of law, to a fair trial[,] free from improper comments by counsel or the trial court" (*Rodriguez v City of New York*, 67 AD3d 884, 886 [2d Dept 2009]). Where counsel's conduct violates this principle, the courts have not hesitated to set aside a verdict tainted by such conduct. Here, the summation "had as its continuing theme" personal attacks on defense counsel, charges that defense witnesses outright lied, allusions of subornation of perjury by counsel and "assertions of personal knowledge and personal opinion as to the case and the credibility of witnesses" (*Caraballo v City of New York*, 86 AD2d 580, 581 [1st Dept 1982]). A few examples will serve to convey the tone of this summation.

Early in his summation, counsel began by vouching for his own credibility and casting aspersions on the integrity of opposing counsel by saying:

> "When Jim and Eileen Gregware came to me to represent them, all can I do is give it my all, if

somebody's coming to me, yes, I will do whatever I can, within the bounds of decency, of honesty, to represent them. I will not cross that line, it will never happen if I'm trying the case. . . . But its wrong when lawyers stand before you and give you fast and loose synopses of the case. When lawyers do that, I have to tell you, there's something very, very wrong with our system . . . The credibility of the lawyer is equally important [as the witnesses'']."

He went on to state that "believability and credibility, that is all that we have as lawyers."

Counsel then transitioned into the first of repeated characterizations of defense witnesses as liars in directly addressing counsel for the City (Mr. Wang) and counsel for defendant contractor (Mr. Baxter) stating: "Credibility, Mr. Wang? Really? Your own witness lied. And to Mr. Baxter: Your own witnesses lied." Shortly thereafter, while commenting on the testimony of a defense witness, plaintiff's counsel stated: "I wonder if Mr. Wang even believes that [testimony] when his own witness said something like that." During the course of his summation, counsel repeatedly denigrated each and every defense witness, calling them "liars" and unworthy of belief; calling the City's expert a "phony baloney" on at least three occasions; characterizing a police officer's testimony as "disgusting and reprehensible" and repeatedly charging that both the witnesses and counsel were "trying to deny justice to Jim and Eileen Gregware." Indeed, variations on this phrase became an overarching refrain in support of counsel's theory of a tightly woven conspiracy between defense counsel, particularly counsel for the City and the witnesses called to testify for the defense, and was used with various embellishments at least seven times during the course of the summation, usually in the form of "Why are they trying so hard to deny justice to Jim and Eileen Gregware?"

Additionally, counsel repeatedly vouched for his own credibility, using phrases such as "I was there, I did the deposition, I read it carefully"; inserted his personal beliefs and feelings as to the credibility of various defense witnesses including his clients and experts; and even made veiled references as to possible misconduct by defense counsel in the preparation for trial of those witnesses. This is clearly evident with respect to the police officer witness who testified. It is true, as the majority points out, that the jury had ample reason to question the

testimony of the police officer, who testified at prior depositions that he had no recollection of this accident but was able to testify as to details of the accident at trial. Counsel properly pointed out and hammered this rather large discrepancy to the jury during cross-examination and summation. But instead of leaving it to the jury to determine what weight, if any, to give to this testimony, counsel substituted his own personal opinion of, and indignation at, this testimony by repeatedly harping on his theme of an alleged defense conspiracy to deny plaintiffs justice, using less than oblique accusations of defense counsel's subornation of perjury. One example will suffice to prove this point:

> "It is infuriating to me that they would go this far to try to change the testimony of an officer who stated under oath hundreds of times that he didn't remember, that he didn't know . . . I was so infuriated that an officer, again, who was duty bound to uphold the law would come into this courthouse, come in here and somehow tell you that it is okay to speak with lawyers who weren't there and then have memory. Ladies and gentlemen, when a police officer comes in this courtroom and a police officer comes in here and is fed information by his attorneys, his attorneys who he knows for a fact were not there, and they are telling him what happened and then Mr. Wang stands up and says, oh, he knows exactly where the accident happened—

> "MR. WANG: Objection.

> "THE COURT: This is fair comment on the evidence.

> "MR. RUBINOWITZ: Mr. Wang tells you, he certainly knows . . . but the problem is this, you have an officer, an officer who is duty bound to uphold the law is doing something that is so terribly wrong, and I'm trying to tell you because it is so wrong for an officer to swear to tell the truth and tell less than the truth under oath, it's wrong."

Continuing in this same vein, counsel stated: "I have a lot of respect for the New York City Police Department and its officers, and we all should, but that man is not one of New York City's finest. If anything, he is one of New York City's wors[t]." He also addressed the City's counsel directly, stating: "Mr. Wang, I don't blame you for being looking down . . . why in the world is a police officer allowed to take the stand and tell

less than the truth?" To compound the error, the court, rather than sustaining the objection to the comment that the police officer was being "fed information by his attorneys," stated this was "fair comment on the evidence," giving, in effect judicial, imprimatur to counsel's allegations of subornation of perjury.

The conspiracy theme continued with plaintiffs' counsel referring to the City's expert as a "phoney baloney" at least three times, and counsel stating: "I'm asking you when you go into the jury room to say this, it is appropriate for the City of New York to stoop so low to call somebody like [the City's expert] to deny Jim Gregware and Eileen Gregware justice?" Counsel drew attention to the discussion of the expert's fee, stating: "You need an opinion, he will give you an opinion. Pay for it, he will give you an opinion." In observing that under cross-examination, the expert said the City was his biggest client, counsel stated: "Would you like to keep the cash register rolling? Sure, who wouldn't? When you put a phoney baloney on the witness stand, it is not right, and that man should not be testifying at all anymore."

Toward the end of his summation, counsel repeated his personal opinions of the City's witnesses, particularly the police officer and its expert, stating:

> "And when they [i.e., the City's attorneys] present a witness like that police officer, I'll say this to you. I have certain words to describe that police officer. And I'm gonna use these words specifically, because it is something that angers me terribly, and it should anger you. What that police officer did in this courtroom was disgusting, it was reprehensible. To have a man who's bound to uphold the law, come into this courtroom and tell less than the truth. It is unacceptable. And to have a man like [the City's expert] come into this courtroom and tell you that he has done a full, fair, thorough and complete review and evaluation, that is also disgusting and it is terrible, it is reprehensible, and it should not be allowed . . . And those were two major witnesses put on by Mr. Wang and his lawyers."

I certainly take no issue with the majority's observation that counsel was entitled to "express skepticism" regarding the police officer's testimony, particularly regarding his "radically improved memory," or counsel's arguing to the jury that the defense witnesses were not worthy of belief because of

discrepancies and inconsistencies in their testimony. Robust cross-examination and argument are to be expected as part of zealous advocacy. Had counsel stopped at expressing skepticism, even repeatedly, and left the issue for the jury's determination, there would be no issue. But here, counsel's expression of "skepticism" went well beyond the pale of fair comment. In fact, the majority concedes that the repeated references to defense witnesses as "liars" was inappropriate. I disagree with the majority's position that these remarks were harmless because they were "isolated and constituted fair comment on the evidence." The record clearly reflects that they were neither. In truth, counsel had much to work with regarding these witnesses. However, that only makes his characterizations, personal opinions, and attacks all the more prejudicial and regrettable. They were designed to create an inflammatory and prejudicial atmosphere against the defendants and, given the virulence and repetition of the statements, it cannot be said that they did not have their intended effect on the jury. Indeed, the majority tacitly recognizes this fact by its determination to remand this matter for a trial on the allocation of damages.

Nor can I agree with the majority that the City's assertion that counsel vouched for his own credibility is a distortion of the record. The few instances quoted here (and there were more) suffice to demonstrate that these assertions were not isolated but rather were pervasive and part and parcel of an overall theme which, taken as a whole, served to inflame the passions of the jury, contaminate the proceedings and deny defendants a fair trial.

Each and every one of the above comments, when repeated without curative instructions, has been held to constitute grounds for a new trial. For example, we have ordered a new trial where counsel

> "made himself an unsworn witness and attempted to vouch for the credibility of his clients[,] . . . implied that defense counsel made up the defense raised by the defendants, . . . labeled the defendants' expert a hired gun and insinuated that the defense experts were unworthy of belief because they were being compensated" (*Nuccio v Chou*, 183 AD2d 511, 514-515 [1st Dept 1992], *lv dismissed* 81 NY2d 783 [1993]).

Likewise, where counsel bolstered his case in summation "by repeated accusations that the witnesses for the other side are liars" and that defendant's experts are "willing to testify falsely for a fee" (*Clarke v New York City Tr. Auth.*, 174 AD2d 268, 277-278 [1st Dept 1992]), a new trial was ordered (*see also Rodriguez v New York City Hous. Auth.*, 209 AD2d 260, 261 [1st Dept 1994] [new trial ordered where "(p)laintiff's counsel improperly intimated that defendant's medical expert was unworthy of belief because he was compensated for his appearance at trial"]).

Similarly, we set aside a verdict where counsel, in twice claiming that the City was fabricating evidence "vouched for his own credibility and sought to bolster it as well by improperly invoking his status as a member of the bar" (*Valenzuela v City of New York*, 59 AD3d 40, 45 [1st Dept 2008]). In *Valenzuela*, counsel stated "he never created half truths or tried to fool the jury and had not done so in this case" (*id.*), not unlike the comments plaintiffs' counsel made here, stating: "I will not cross that line" regarding the bounds of honesty and decency.

A new trial was also ordered where plaintiff's counsel in summation repeatedly impugned the integrity of defense counsel and defense witnesses, the result of which "could only have been devastatingly prejudicial to defendants and amounted to a violation of their right to a fair trial" (*Berkowitz v Marriott Corp.*, 163 AD2d 52, 54 [1st Dept 1990]). In *Berkowitz*, we found counsel's statement that defense counsel "possibly . . . doesn't even believe himself some of the things that he said, but he has to do what he has to do" to be "egregious" (*id.*). In this regard, *Pareja v City of New York* (49 AD3d 470 [2008]) is instructive. There, counsel's remarks concerning opposing counsel were brief, and not so inflammatory that they affected the outcome of the trial. Despite the fact that we did not order a new trial, we stated: "We nonetheless observe that the remarks of defense counsel were uncalled for. There is no justification for attacking the credibility of opposing counsel. The veracity of counsel is simply not a subject for summation" (*id.* at 470). Here, the repeated attacks on the integrity of opposing counsel "and the irrevelant fact that [defendant's] counsel was a member of a large, well-known law firm," coupled with an "implicit charge of subordination of perjury, cannot allow us to rule out the strong possibility that such remarks influenced the verdict" and thus require a new trial (*Wein-*

*berger v City of New York*, 97 AD2d 819, 819-820 [2d Dept 1983]).*

In *Kohlmann v City of New York* (8 AD2d 598, 598 [1st Dept 1959]) when faced with similar conduct, we held, "It is regrettable that despite the apparent strength of the plaintiffs' case a new trial must be ordered in the interests of justice." Based on the record in this case and the lessons of our prior holdings, we should remand the matter for a new trial.

CLARK and KAPNICK, JJ., concur with MANZANET-DANIELS, J.; SWEENY, J., dissents in a separate opinion in which TOM, J.P., concurs.

Judgment, Supreme Court, New York County, entered October 15, 2013, modified, on the law and the facts, to grant the City's motion for summary judgment on its cross claim, and to remand the matter for a new trial on the issue of the apportionment of liability as between the City and Burtis, and otherwise affirmed, without costs.

---

* Plaintiffs' counsel here also made several references in his summation to the fact Mr. Wang and the attorneys assisting him at trial were from a large, well-known firm.